**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IAN DUSCI, derivatively on behalf of HUMACYTE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JOHN BAMFORTH, EMERY N. BROWN, MICHAEL T. CONSTANTINO, BRADY W. DOUGAN, C. BRUCE GREEN, KEITH ANTHONY JONES, LAURA E. NIKLASON, TODD M. POPE, HEATHER PRICHARD, DALE A. SANDER, KATHLEEN SEBELIUS, DIANE SEIMETZ, MAX WALLACE, and SUSAN WINDHAM-BANNISTER,<br><br>Defendants,<br><br>and<br><br>HUMACYTE, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**Jury Trial Demanded** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Ian Dusci ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Humacyte, Inc. ("Humacyte" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants, as defined below, and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Humacyte with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by Humacyte; (iii) a securities class action against certain officers and a member of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading between August 14, 2023 and March 25, 2025 with respect to Humacyte's business, operations, and prospects (the "Securities Class Action")[1]; and (iv) other publicly available information concerning Humacyte.

## NATURE OF THE ACTION

1. This is a stockholder derivative action asserted on behalf of Nominal Defendant Humacyte against certain officers and the members of the Company's Board for the claims asserted herein to recover damages caused to the Company from August 14, 2023 to March 25, 2025 (the "Relevant Period").

2. Humacyte's manufacturing and research and development facilities are located in Durham, North Carolina where the Company leases approximately 83,000 square feet of space

[1] *In re Humacyte, Inc. Securities Litigation*, C.A. No. 1:24-cv-00954 (M.D. N.C.).

(the "Durham Facility"). This space includes, among other things, approximately 55,000 square feet for production and distribution operations, including manufacturing, bioprocessing, quality control, mechanical space, and inventory.

3. Humacyte markets itself as a pioneer in developing and manufacturing off-the-shelf, "universally implantable bioengineered human tissues, advanced tissue constructs, and organ systems to improve the lives of patients and transform the practice of medicine."

4. The Company's primary focus is to engineer and manufacture Human Acellular Vessels™ ("HAVs" or "ATEVs")[2] that can be easily implanted into any patient without inducing a foreign body response or immune rejection.

5. The Company manufactures its 6-millimeter HAVs for its clinical trials at the Durham Facility, where Humacyte purportedly created a scalable modular manufacturing process known as the LUNA200 system. According to Humacyte, the LUNA200 system would enable it to manufacture HAVs in commercial quantities in compliance with current good manufacturing practices ("cGMPs").

6. Throughout the Relevant Period, the Individual Defendants made a series of false and misleading statements involving three categories of information: (i) the safety of HAV ("Product Safety Fraud"); (ii) whether the Company had sufficient cash and cash equivalents to fund its operations ("Liquidity Fraud"); and (iii) the Durham facility's readiness to manufacture HAV with sufficient quality assurance and in compliance with U.S. Food and Drug Administration ("FDA") inspection and oversight requirements ("Facility Fraud").

[2] The term HAV was originally used for the Company's engineered vessel product candidate. The common (non-brand) name is Acellular Tissue Engineered Vessel ("ATEV"), which later replaced the term.

7. The Individual Defendants were engaging in Product Safety Fraud as early as August 14, 2023 by touting HAV's safety and efficiency and positive components of its clinical trials – all the while downplaying or omitting known safety concerns, inherent flaws in its trials, and flaws in the trials' statistical analysis. These safety and efficacy issues included:

(i) known, critical safety risks, including: (a) rupture, anastomatic and suture failure, and (b) quality control failures;

(ii) method flaws in the studies and clinical trials, including: (a) using inappropriate benchmarks that had not been agreed to by the FDA and (b) using a retrospective and observational method for the V017 trial, allowing for cherry-picked results; and

(iii) statistical method flaws in the clinical trials, including: (a) using a "while on treatment" or "last observation carried forward" statistical model to report patients who did not have a 30-day follow up as successes – even if the patients died or had limbs amputated; (b) overstating the safety and efficacy data of the V005 and V017 trials by ignoring long-term safety data relevant to the FDA; (c) manipulating ongoing studies by changing design, study population, sample size, and efficacy endpoints during the studies.

The Individual Defendants also misrepresented these safety and efficacy issues by failing to disclose that they were the basis of the delayed Prescription Drug User Fee Act ("PDUFA") date.

8. Also on August 14, 2023 and thereafter during the Relevant Period, the Individual Defendants engaged in Liquidity Fraud by representing that the Company had sufficient cash and cash equivalents to fund its operations – without disclosing that, in reality, the Company was facing liquidity crunches that would ultimately result in public offerings at share prices significantly discounted from the prevailing stock prices and that their liquidity depended on contingent funding. They also represented that the Company's cash flows – reported as adequate – were only viable if contingent funding came through.

9. On May 12, 2023, the Company entered into a Revenue Interest Purchase Agreement (the "Oberland Funding Agreement") to finance further development and commercialization of HAVs and for other purposes. Humacyte received an initial payment

immediately, but it was still entitled to receive additional installments of up to $110 million, contingent on certain terms and conditions – including the Company hitting certain sales thresholds and receiving Biologics License Application ("BLA") approval for an indication in vascular trauma on or prior to March 31, 2024.

10. By September 12, 2023, the Individual Defendants were also making material misrepresentations about the Durham Facility's readiness to safely manufacture HAVs, the FDA's facility inspections, and the sufficiency of the facility's quality assurance and oversight for FDA approval.

11. On December 12, 2023, Humacyte announced that it had submitted a BLA to the FDA for approval of the HAV for vascular trauma applications.

12. On February 9, 2024, the Company announced that the FDA had accepted the BLA and granted it Priority Review[3], establishing a PDUFA date of August 10, 2024.

13. Despite the Company's hopes to manufacture its HAVs at its Durham Facility, it was experiencing internal control issues and did not disclose to investors that the FDA determined that the Durham Facility failed to comply with certain quality assurance practices, which contributed to a delayed regulatory review by the FDA for Humacyte's BLA for HAV.

14. Certain officers and directors knew or should have known of the FDA's findings since at least April 5, 2024, the day the FDA issued a Form 483 (the "Form 483 Letter") notifying the Company of its lack of internal controls and failures related to certain quality assurance practices.

[3] Priority Review is a designation given to drugs that, if approved, would provide significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions. This designation shortens the FDA review time from the standard ten months to six months.

15. Notwithstanding the Form 483 Letter, on April 29, 2024, the Company filed a proxy statement that contained materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, certain officers and directors failed to disclose to investors that the: (i) HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies, (ii) Company did not have sufficient funds for operations without cash infusions from public offerings and contingent funding; and (iii) Individual Defendants did not fulfill their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility. Specifically, the Individual Defendants' statements about the Company's cash and cash equivalents were false and misleading because they failed to disclose that, in reality, the Company was facing liquidity crunches that would ultimately result in public offerings at share prices significantly discounted from the prevailing stock prices and that their liquidity depended on contingent funding. Furthermore, the Individual Defendants failed to disclose that due to the failures of oversight and quality assurance: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEVs for vascular trauma. Finally, the Individual Defendants failed to disclose to investors that, as a result of the foregoing the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

16. On May 10, 2024 – approximately one month *after* the FDA issued its finding – Humacyte's officers and directors continued to mislead investors by falsely claiming that the: (1) FDA's review of the Company's BLA was proceeding smoothly and "on track"; (2) FDA had

already completed its pre-licensing inspection of Humacyte's manufacturing facilities as part of the BLA review process; and (3) Company remained on track for commercial launch preparations following anticipated approval by the PDUFA date.

17. Then, on August 9, 2024, after the market closed, the Company issued a press release announcing that the FDA required additional time to review the Company's BLA but that, based on interactions with the FDA, Humacyte was confident of its approval for the treatment of vascular trauma. On this news, the Company's stock price declined approximately $1.30, or 16.4%, to close at $6.62 per share on August 12, 2024, on unusually heavy volume.

18. Following this disclosure, on August 13, 2024, Humacyte issued a press release announcing its second quarter 2024 financial results, touting that the "FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing" and these interactions led the Company to be "confident in the approvability of the ATEV in treating vascular trauma."

19. On October 17, 2024, during market hours, the FDA released the Form 483 Letter. On this news, Humacyte's common stock dropped $0.95, or about 16%, per share to close at $4.86 per share on October 17, 2024.

20. On December 19, 2024, Humacyte announced FDA approval of its HAVs, framing the approval as a wholesale success – but omitting critical information. Specifically, this press release did not explain that the approval was much narrower than the original BLA request or that the FDA had imposed unusual post-marketing requirements and commitments beyond standard practice.

21. Meanwhile, throughout the Relevant Period, the Individual Defendants repeatedly insisted that Humacyte's cash and cash equivalents were sufficient to fund operations. Despite

these assurances, Humacyte repeatedly blindsided investors by raising capital at disadvantageous prices, including on February 29, 2024, August 13, 2024, September 24, 2024, and November 14, 2024. Each announcement of the Company accessing capital markets to raise cash resulted in significant price drops to the Company's stock.

22. The closing price dropped from $4.35 per share February 29, 2024 to $3.24 per share on March 1, 2024 – a 25.52% decrease. The closing price dropped from $6.65 per share on August 13, 2024 to $6.01 per share on August 14, 2024 – a 9.62% decrease. The closing price dropped from $6.12 per share on September 24, 2024 to $5.46 per share on September 25, 2024 – a 10.78% decrease. Finally, the closing price dropped from $5.34 per share at close on November 13, 2024 to $4.84 per share on November 14, 2024, following a pre-market announcement regarding the sale of its common stock – a 9.36% decrease.

23. The truth became fully known through a series of revelations on March 24 and 25, 2025.

24. First, on March 24, 2025, *The New York Times* published an exposé (the "*NYT* exposé"). The *NYT* exposé revealed that certain FDA staff members found one of Humacyte's HAV studies "severely lacking." The *NYT* exposé also revealed, *inter alia*: (i) insufficient four-month safety checks, (ii) potentially fatal ruptures, (iii) failure to meet the usual criteria for an adequate and well-controlled study; (iv) HAV's success rate in its key study was only 67% – not 84% as Humacyte had claimed, and (v) one FDA medical device reviewer had even retired in protest over these issues.

25. Second, on March 25, 2025, *Bloomberg* published an article stating that one FDA reviewer had said that Humacyte's two trials could not be combined and that Humacyte had repeatedly attempted to change its clinical studies while they were still ongoing. The article also

reported safety concerns including the "serious risk" of failure and the fact that the product did not "demonstrate superiority to existing treatment options."

26. Also on March 25, 2025, the Company announced pricing for a public offering of 25 million shares. The final prospectus set the price at $2.00 per share – substantially lower than the $2.86 closing price earlier that day.

27. On this news, Humacyte's common stock dropped from $3.32 per share on March 24, 2025 to $2.88 per share on March 25, 2025 – a decrease of approximately 13%. Then, the stock price further declined approximately 31%, closing at $2.00 per share on March 26, 2025.

28. The Individual Defendants' false and misleading statements and omissions have subjected the Company to a federal securities class action filed in the United States District Court for the Middle District of North Carolina (the "Securities Class Action"), significant legal costs, and severe reputational harm that has damaged the Company's ability to raise capital, maintain commercial relationships, and pursue its business objectives.

29. As a direct and proximate result of the misconduct described herein by the Individual Defendants, Humacyte has sustained significant damages as explained below.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Securities Exchange Act (the "Exchange Act"), and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

31. This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the

Court permissible under traditional notions of fair play and substantial justice. The Company is incorporated in this State. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state.

32. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Humacyte. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Humacyte could have sued the same Defendants in this District.

## PARTIES

33. Plaintiff is a Humacyte stockholder and has continuously held Humacyte stock from the time of the wrongdoing alleged herein until the present. Plaintiff will fairly and adequately represent Humacyte's interest in this action.

34. Nominal Defendant Humacyte is incorporated under the laws of Delaware, and its principal executive offices are located at 2525 East North Carolina Highway 54, Durham, North Carolina 27713. Humacyte is the result of a special purpose acquisition ("SPAC") transaction between Humacyte, Inc. ("Legacy Humacyte") and Alpha Healthcare Acquisition Corp. ("AHAC"). The merger was consummated on August 26, 2021 (the "Merger"). Humacyte's common stock trades on the Nasdaq exchange under the symbol "HUMA."

35. Defendant John Bamforth ("Bamforth") has served as a member of the Board since June 2024. He also served as a member of the Commercial Committee during the Relevant Period. In 2024, Bamforth received $449,247 in total compensation from the Company.

36. Defendant Emery Brown ("Brown") has served as a member of the Board since the Merger in August 2021. In 2024, Brown received $331,000 in total compensation from the Company.

37. Defendant Michael Constantino ("Constantino") has served as a member of the Board since the Merger in August 2021. He has served as Chair of the Audit Committee since at least April 2022. In 2024, Constantino received $338,500 in total compensation from the Company.

38. Defendant Brady Dougan ("Dougan") has been a member of the Board since the Merger in August 2021. Previously, he served as a member of Legacy Humacyte's board of directors from 2005 and as its Chair from March 2019 to August 2021. In 2024, Dougan received $331,000 in total compensation from the Company. Throughout the Relevant Period, Dougan sold Company stock through relevant non-party Ayabudge LLC ("Ayabudge"), an entity Dougan controlled. Additional shares were also sold in a private transaction to a trust controlled by Dougan's spouse, Defendant Laura E. Niklason ("Niklason"). Dougan sold over 8.2 million shares of Company stock for proceeds of almost $39 million. These transactions are shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/17/23 | 570,174 | $ 3.68 | $ 2,098,240.32 |
| 8/18/23 | 626,979 | $ 3.57 | $ 2,238,315.03 |
| 8/21/23 | 602,443 | $ 3.39 | $ 2,042,281.77 |
| 9/14/23 | 2,000,000 | $ 2.78 | $ 5,560,000.00 |
| 5/31/24 | 716,573 | $ 7.78 | $ 5,574,937.94 |
| 5/31/24 | 93,213 | $ 8.93 | $ 832,392.09 |
| 6/3/24 | 190,214 | $ 7.42 | $ 1,411,387.88 |
| 6/4/24 | 1,852 | $ 7.28 | $ 13,482.56 |
| 6/11/24[4] | 282,000 | $ 7.0922 | $ 2,000,000.40 |
| 6/11/24 | 76,630 | $ 7.02 | $ 537,942.60 |
| 6/12/24 | 271,518 | $ 7.30 | $ 1,982,081.40 |
| 8/27/24 | 252,676 | $ 6.71 | $ 1,695,455.96 |

[4] All the transactions Dougan reported were made by Ayabudge *except* for the transaction made on June 11, 2024 disposing of 282,000 shares. For that particular June 11, 2024 transaction, the shares were sold in a private transaction to a trust controlled by Niklason's family members.

| | | | |
|---|---|---|---|
| 8/28/24 | 277,090 | $ 6.47 | $ 1,792,772.30 |
| 8/29/24 | 352,112 | $ 6.35 | $ 2,235,911.20 |
| 9/9/24 | 157,704 | $ 5.42 | $ 854,755.68 |
| 9/10/24 | 288,674 | $ 5.23 | $ 1,509,765.02 |
| 11/18/24 | 811,172 | $ 4.44 | $ 3,601,603.68 |
| 11/19/24 | 427,459 | $ 4.34 | $ 1,855,172.06 |
| 11/20/24 | 261,369 | $ 4.40 | $ 1,150,023.60 |
| **Total** | **8,259,852** | | **$ 38,986,521.49** |

39. Defendant Bruce Green ("Green") has served as a member of the Board since September 2022. He also served as a member of the Commercial Committee during the Relevant Period. In 2024, Green received $331,000 in total compensation from the Company.

40. Defendant Keith Jones ("Jones") has served as a member of the Board since June 2024. He also served as a member of the Commercial Committee during the Relevant Period. In 2024, Jones received $449,247 in total compensation from the Company.

41. Defendant Niklason has served as President, CEO, and a member of the Board since the Merger in August 2021. She is the founder of Legacy Humacyte, where she served as President and CEO since November 2020 and as a director since 2004. Niklason is married to Dougan and is named as a defendant in the Securities Class Action. In 2024, Niklason received $905,436 in total compensation from the Company.

42. Defendant Todd Pope ("Pope") has served as a member of the Board since the Merger in August 2021. He also served as a member of the Commercial Committee since at least 2023. In 2024, Pope received $336,000 in total compensation from the Company.

43. Defendant Heather Prichard ("Prichard") has served as the Company's COO since the Merger in August 2021. Previously, she served in various roles within Legacy Humacyte starting in 2008, including as Senior Vice President of Product Development from April 2016 to February 2019 and most recently serving as COO since March 2019. In 2024, Prichard received

$653,205 in total compensation from the Company. Throughout the Relevant Period, Prichard sold 191,511 Company shares for proceeds of over $1.5 million, as shown by the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/30/24 | 61,941 | $ 7.71 | $ 477,565.11 |
| 5/30/24 | 78,779 | $ 8.36 | $ 658,592.44 |
| 5/30/24 | 48,166 | $ 8.32 | $ 400,741.12 |
| 5/31/24 | 2,625 | $ 9.412 | $ 24,706.50 |
| **Total** | **191,511** | | **$ 1,561,605.17** |

Prichard is named as a defendant in the Securities Class Action.

44. Defendant Dale Sander ("Sander") has served as the Company's Chief Financial Officer ("CFO"), Chief Corporate Development Officer, and Treasurer since the Merger in August 2021. Previously, he served as Legacy Humacyte's CFO and Treasurer since May 2021, as its Chief Corporate Development Officer since November 2020, and as a member of its board since September 2015. In 2024, Sander received $704,189 in total compensation from the Company. On August 27, 2024, Sander sold 39,389 Company shares for proceeds of over $263,000, as shown by the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/27/24 | 39,389 | $ 6.68 | $ 263,118.52 |
| **Total** | **39,389** | | **$ 263,118.52** |

Sander is named as a defendant in the Securities Class Action.

45. Defendant Kathleen Sebelius ("Sebelius") has served as a member of the Board since the Merger in August 2021. She has served as a member of the Audit Committee since the Merger. Sebelius also served as Chair of the Board throughout the Relevant Period. She previously served as a member of the Legacy Humacyte board since September 2015. In 2024,

Sebelius received $356,000 in total compensation from the Company. On September 9, 2024, Sebelius sold 5,182 Company shares for proceeds of over $28,000, as shown by the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 9/10/24 | 3,634 | $ 5.41 | $ 19,659.94 |
| 9/10/24 | 1,548 | $ 5.39 | $ 8,343.72 |
| **Total** | **5,182** | | **$ 28,003.66** |

46. Defendant Diane Seimetz ("Seimetz") has served as a member of the Board since June 2022. She also served as a member of the Commercial Committee during the Relevant Period. In 2024, Seimetz received $331,000 in total compensation from the Company.

47. Defendant Max Wallace ("Wallace") has served as a member of the Board since the Merger in August 2021. He previously served as a member of the Legacy Humacyte board since June 2005. In 2024, Wallace received $336,000 in total compensation from the Company.

48. Defendant Susan Windham-Bannister ("Windham-Bannister") has served as a member of the Board and as a member of the Audit Committee since the Merger in August 2021. She has served as the Chair of the Commercial Committee since at least 2023. In 2024, Windham-Bannister received $331,000 in total compensation from the Company.

49. Relevant Non-Party Ayabudge is a limited liability company controlled entirely by Dougan as its sole member. As explained above, Dougan made trades through Ayubudge during the Relevant Period.

50. The following Defendants are collectively referenced herein as the "Individual Defendants:" Bamforth, Brown, Constantino, Dougan, Green, Jones, Niklason, Pope, Prichard, Sander, Sebelius, Seimetz, Wallace, and Windham-Bannister.

51. The following Individual Defendants are collectively referenced herein as the "Director Defendants:" Bamforth, Brown, Constantino, Dougan, Green, Jones, Niklason, Pope, Sebelius, Seimetz, Wallace, and Windham-Bannister.

52. The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants:" Dougan, Prichard, Sander, and Sebelius.

53. The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants:" Constantino, Sebelius, and Windham-Bannister.

54. The following Individual Defendants are collectively referenced herein as the "Commercial Committee Defendants:" Bamforth, Green, Jones, Pope, Seimetz, and Windham-Bannister.

55. The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants:" Niklason, Prichard, and Sander.

56. The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

57. At all relevant times, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Humacyte.

58. Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

59. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

60. Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

61. Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

62. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Humacyte were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about

the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and
- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

63. The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

64. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Humacyte.

***Humacyte's Code of Conduct and Ethics***

65. The Board has adopted Humacyte's Code of Conduct and Ethics (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants, including the following:

> Humacyte, Inc. (the "**Company**") requires the highest standards of professional and ethical conduct from its employees, officers[,] and directors. Our reputation for honesty and integrity is key to the success of our business. The Company intends that its business practices will comply with the laws of all of the jurisdictions in

which it operates and that honesty, integrity[,] and accountability will always characterize the Company's business activity. No employee, officer[,] or director may achieve results through violations of laws or regulations or unscrupulous dealings.

This Code of Conduct [] reflects the Company's commitment to a culture of honesty, integrity[,] and accountability and outlines the basic principles and policies with which all employees, officers[,] and directors are expected to comply. Therefore, we expect you to read this Code [of Conduct] thoroughly and carefully.

In addition to following this Code [of Conduct] in all aspects of your business activities, you are expected to seek guidance in any situation where there is a question regarding compliance issues, whether with the letter or the spirit of the Company's policies and applicable laws. Compliance with this Code [of Conduct] is essential to the continued success of the Company's business and the cultivation and maintenance of its reputation as a good corporate citizen. Misconduct is never justified, even where sanctioned or ordered by an officer or other individual in a position of higher management. No individual, regardless of stature or position, can authorize actions that are illegal, or that jeopardize or violate Company standards. We note that this Code [of Conduct] sets forth general principles of conduct and ethics and is intended to work in conjunction with the specific policies and procedures that are covered in the Company's compliance documents or in separate specific policy statements, such as the Humacyte Insider Trading Policy, and you should refer to those policies and procedures for more detail in the specified context.

Nothing in this Code [of Conduct] prohibits you from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the [SEC], the [FDA], the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. You do not need the prior authorization of the Company to make any such reports or disclosures and you are not required to notify the Company that you have made such reports or disclosures.

* * *

**II. Conflicts of Interest**

A conflict of interest exists when private interests, including personal, family, social, or financial interests, interfere in any way with the performance of your responsibilities with respect to the Company. A conflict can arise if you, or an immediate family member, takes actions that can make it difficult for you to perform Company duties objectively, or if you receive personal benefits that are, or appear to be, improper.

* * *

You are required to act in the Company's best interest and to exercise sound judgment, free from personal interests or other loyalties and to refrain from activity that causes an actual or potential conflict of interest in violation of the Humacyte Conflicts of Interest Policy. Any actual or potential conflicts of interest must be reported promptly to the [CFO] (the "Determining Officer"). Further, if you become aware of a conflict or potential conflict involving another employee, officer[,] or director, you should bring it to the attention of the Determining Officer.

* * *

**IV. Public Reporting**

Full, fair, accurate[,] and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications. Such disclosure is critical to ensure that the Company maintains its good reputation, complies with its obligations under the securities laws[,] and meets the expectations of its stockholders.

Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care in accordance with the following guidelines:

- all accounting records, and the reports produced from such records, must comply with all applicable laws;
- all accounting records must fairly and accurately reflect the transactions or occurrences to which they relate;
- all accounting records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues[,] and expenses;
- accounting records must not contain any false or intentionally misleading entries;
- no transactions should be intentionally misclassified as to accounts, departments[,] or accounting periods;
- all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period;
- no information should be concealed from the internal auditors or the independent auditors; and
- compliance with the Company's internal control over financial reporting and disclosure controls and procedures is required.

* * *

> **VII. Insider Trading**
>
> Insider trading is unethical and illegal. Employees, officers[,] and directors must not trade in securities of a company while in possession of material non-public information regarding that company. It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has an Insider Trading Policy, which sets forth obligations with respect of trading in the Company's securities.
>
> * * *
>
> **IX. Compliance with Laws, Rules[,] and Regulations**
>
> Compliance with both the letter and spirit of all laws, rules[,] and regulations applicable to the Company, including any stock exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers[,] and directors must respect and obey the laws of the cities, states[,] and countries in which the Company operates and avoid even the appearance of impropriety.
>
> Employees, officers[,] or directors who fail to comply with this Code [of Conduct] and applicable laws will be subject to disciplinary measures, up to and including discharge from the Company.

***Humacyte's Insider Trading Policy***

66. The Board also adopted Humacyte's Insider Trading Policy, which applies to all directors, officers, and employees, and states as follows:

> **I. PURPOSE**
>
> [Humacyte] has adopted the following policies and procedures with respect to trading in Humacyte securities by members of Company's board of directors, officers[,] and employees. These policies and procedures are designed to help you comply with insider trading laws, handle confidential information properly[,] and avoid potentially embarrassing public disclosures and the appearance of impropriety. You are receiving this policy because you are a Humacyte officer, director[,] or employee, or an external contractor or consultant who has or may have access to material nonpublic information, and are subject to this policy.
>
> All directors, officers[,] and employees, and external contractors and consultants who have access to material nonpublic information, are responsible for reading these policies and procedures and complying with them. Further, even after you are no longer employed by or affiliated with Humacyte, you must maintain the confidentiality of any confidential or proprietary information obtained during your employment or affiliation with Humacyte.

Penalties for violating these policies and procedures may involve any appropriate remedy, including termination of employment. In addition, the [SEC] and criminal prosecutors vigorously enforce insider trading laws. Violation of insider trading laws could result in civil and criminal penalties under applicable federal securities laws.

If you have any questions about the application of these policies and procedures, or if you would like to make a request for an exception, please contact the [CFO]. Although the CFO generally is responsible for the implementation of these policies and procedures, the [Board] may designate employees to carry out any of the duties described below.

**II. PERSONS COVERED**

This policy applies to all (i) directors, officers, employees (permanent or temporary, salaried or hourly) and (ii) external contractors and consultants who have access to material nonpublic information, of Humacyte and its subsidiaries, both inside and outside the United States (collectively, "covered persons"). This policy also applies to all immediate family members of covered persons, any other members of the covered person's family, and other household members (other than tenants and household employees) of covered persons (collectively, "family members"). This policy further applies to all corporations, limited liability companies, partnerships, trusts[,] or other entities controlled by covered persons or family members.

* * *

**IV. POLICY AGAINST INSIDER TRADING**

**A. General Prohibition Against Insider Trading**

Federal and state laws prohibit "insider trading," the purchase or sale of securities, in breach of a fiduciary duty or other relationship of trust and confidence, on the basis of material nonpublic information about the security. Any covered person, or any other person designated by this policy, who has material nonpublic information relating to Humacyte may not, until the information becomes public or is no longer material:

- engage in transactions in Humacyte securities, directly or indirectly, except as specifically noted herein;
- recommend the purchase or sale of any Humacyte securities;
- engage in any other action to take personal advantage of that information, including but not limited to, passing on or "tipping" that information to someone who uses it for personal gain, regardless of the quantity of securities traded;

- disclose material nonpublic information to persons within Humacyte whose jobs do not require them to have that information, or outside of Humacyte to other persons, including, but not limited to family, friends, business associates, investors[,] and expert consulting firms, unless any such disclosure is made in express accordance with Humacyte's policies regarding the protection or authorized external disclosure of information concerning the Company; or

- assist anyone engaged in the above activities.

* * *

In addition, any covered person who learns of material nonpublic information about another entity, including an entity with whom Humacyte does business, may not trade in that entity's securities until the information becomes public.

Although you may believe it is necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure) to engage in a transaction involving Humacyte's securities, there are no exceptions to this policy's prohibition against insider trading. Even the appearance of impropriety must be avoided to preserve Humacyte's reputation for adhering to the highest standards of conduct.

* * *

**B. What Information is "Material"?**

For the purposes of these policies and procedures, information is "material" if a reasonable investor would consider that information important in making a decision to trade securities. It is also information that, if disclosed, is reasonably likely to affect the market price of Humacyte's securities. Both positive and negative information can be material. Further, courts and the SEC have declined to identify all information that could be deemed to be material.

Some examples of material information include:

* * *

- threatened litigation or administrative actions, or material developments in such matters;

* * *

- significant developments or announcements involving the [FDA] and any Humacyte products, regulatory applications, or clinical trials;

* * *

- significant research and development initiatives, clinical studies, clinical data[,] or new product prospects;

* * *

**C. What Information is "Nonpublic"?**

Information is "nonpublic" if it has not been widely disseminated to the public, such as through a press release carried over a major news service, a public filing with the SEC[,] or materials sent to stockholders (e.g., a proxy statement or widely disseminated prospectus). Information is also nonpublic if it has been widely disseminated to the public, but sufficient time has not elapsed to permit the investment community to absorb and evaluate the information. In general, one full business day after public release is deemed sufficient for investor absorption and evaluation.

The distribution of information through narrower channels may be insufficient to make it public. For example, merely posting information on a website may not satisfy the "widely disseminated" standard to make such information public. Also, the fact that nonpublic information is reflected in rumors in the marketplace does not mean that the information has been publicly disseminated. It is important to note that even after information becomes public, many aspects relating to a matter may remain nonpublic.

***Humacyte's Audit Committee Charter***

67. The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Constantino, Sebelius, and Windham-Bannister during the Relevant Period.

68. Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

**I. PURPOSE**

The purpose of the Audit Committee (the "***Committee***") of the [Board] is to assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting[,] and controls and certain key corporate governance functions of the Board. The Committee's principal functions are to (i) oversee the quality and integrity of the Company's financial statements and accounting and financial reporting processes, systems of internal control[,] and the audits of the Company's financial statements by the Company's independent auditors (the "***Independent Auditors***"), (ii) oversee the Independent Auditors' qualifications and independence and the performance of the Company's internal

audit function and the Independent Auditors, (iii) provide risk management and governance oversight, and (iv) ensure the Company's compliance with legal and regulatory requirements.

* * *

**III. RESPONSIBILITIES AND DUTIES**

* * *

**A. Financial Statements and Disclosures.** The Committee is responsible for oversight of the independent audit of the Company's financial statements. The Committee will:

1. Review the Company's annual and quarterly financial statements prior to their public release, including any report on the Company's internal control over financial reporting and any report or opinion by the Independent Auditors, and consider whether such statements, reports[,] and opinions are complete, consistent with information known to the Committee[,] and reflective of appropriate accounting principles.

2. Review other sections of any annual or quarterly report or similar filing and any related regulatory filings, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to consider the accuracy and completeness of the information contained therein prior to their public release.

3. If appropriate, recommend the annual audited financial statements to the Board for inclusion in the Company's Annual Report on Form 10-K.

4. In connection with the Committee's review of the annual and quarterly financial statements:

    - discuss the financial statements and the results of the Independent Auditors' audit or review, as applicable, of the financial statements with the Independent Auditors, the internal audit function[,] and the Company's management;

    - discuss any items communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "***PCAOB***"). These discussions should include the Independent Auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements, any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information, and any other

matters related to the conduct of the audit, including any "critical audit matters";

- discuss with the Company's management and the Independent Auditors the Company's selection, application[,] and disclosure of critical accounting policies and practices; and

- review and discuss with the Company's management earnings press releases and the use of any "pro forma" financial information or non-GAAP financial measures, prior to public disclosure.

* * *

**E. Compliance; Values[,] and Ethics.** With respect to the Company's compliance process and its values and ethics practices, the Committee will:

1. Oversee the Company's (i) compliance with applicable laws and regulations, (ii) compliance framework[,] and (iii) compliance program.

2. Oversee the investigation and follow-up (including disciplinary action) of any instances of material or significant noncompliance, including reports that involve actual or alleged violations of the Company's Code of Conduct [].

3. Review ongoing investigations, findings of any examinations by regulatory authorities, and the Company's responses to such investigations, findings[,] and examinations.

4. Review and discuss quarterly updates from the Company's management and legal counsel regarding compliance matters.

5. Investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

6. Establish procedures for the receipt, retention[,] and treatment of complaints received by the Company regarding accounting, internal accounting controls[,] or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

7. Oversee the Company's systems and controls for ethical behavior and the prevention of bribery and receive and respond to reports on non-compliance.

***Humacyte's Commercial Committee Charter***

69. The Charter of the Commercial Committee (the "Commercial Committee Charter") places additional duties and responsibilities upon the members of the Board's Commercial

Committee, which consisted of Bamforth, Green, Jones, Pope, Seimetz, and Windham-Bannister during the Relevant Period.

70. Pursuant to the Commercial Committee Charter, the purpose of the Commercial Committee is to "assist the Board on matters relating to the Company's strategy, activities, and investment in research, development, manufacturing, go-to-market strategies, pricing, sales, external innovation[,] and business development initiatives. [The Commercial Committee Charter] sets forth the authority and responsibility of the [Commercial] Committee in fulfilling its purpose." In a section titled "Responsibilities and Duties," the Commercial Committee Charter identifies the following responsibilities and duties of Commercial Committee members:

1. Review the overall scientific, research and development, and external innovation strategy of the Company and report to the Board regarding such review in order to help facilitate the Board's oversight of the Company's innovation strategy and goals;

2. Review the Company's research and development pipeline and discuss opportunities for further product development or enhancements;

3. Review the competitive landscape in terms of related external scientific research, discoveries[,] and commercial developments, and potential future innovations, as appropriate;

4. Review and consider management's prioritization decisions regarding the allocation, deployment, utilization of[,] and investment in the Company's products, go-to-market capabilities[,] and scientific and development assets;

5. Oversee and consider the Company's strategy relating to the commercialization of any of the Company's products approved by the [FDA] or any other government regulator;

6. Review and assess the Company's intellectual property portfolio and strategy;

7. Review and make recommendations to the Board on the Company's internal and external investments in science and technology, including external investments in R&D such as potential acquisitions, alliances, collaborations, equity investments, contracts[,] and grants; and

8. Fulfill the Committee's responsibilities or other functions as assigned by law, the Company's certificate of incorporation or bylaws, the Board[,] or the Company's other policies.

## SUBSTANTIVE ALLEGATIONS

**General Background**

71. Humacyte is the result of a SPAC transaction between Legacy Humacyte and AHAC. The merger was consummated on August 26, 2021, according to a merger agreement between Legacy Humacyte, AHAC, and Hunter Merger Sub ("Merger Sub"), which was a wholly owned subsidiary of AHAC. As a result of the Merger, Merger Sub merged with and into Legacy Humacyte, with Legacy Humacyte continuing as the surviving corporation and as a wholly owned subsidiary of AHAC. AHAC changed its name to Humacyte, Inc., and Legacy Humacyte changed its name to Humacyte Global, Inc.

72. Humacyte's corporate headquarters, manufacturing, and research and development facilities are located at the Durham Facility.

73. Humacyte markets itself as a pioneer in developing and manufacturing off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs, and organ systems. The Company's stated goal is to improve the lives of patients and transform the practice of medicine.

74. According to the Company, its regenerative medicine technology has the potential to overcome limitations in existing standards of care and address the lack of significant innovation in products that support tissue repair, reconstruction, and replacement. Humacyte purports to leverage its novel, scalable technology platform to develop proprietary, bioengineered, acellular human tissues for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

75. The Company's primary focus is to engineer and manufacture HAVs, that can be easily implanted into any patient without inducing a foreign body response or immune rejection.

76. The Company manufactures its 6-millimeter HAVs for its clinical trials at the Durham Facility, where Humacyte has purportedly created a scalable modular manufacturing process known as the LUNA200 system. According to Humacyte, the LUNA200 system would enable it to manufacture HAVs in commercial quantities in compliance with cGMPs.

77. On May 12, 2023, the Company entered into the Oberland Funding Agreement to finance further development and commercialization of HAVs and for other purposes. Under the agreement, Humacyte received an initial, up-front payment of $40 million (the "First Payment").

78. Additionally, the Company was entitled to receive additional, contingent installments of up to $110 million. Under the installment scheme, each payment was contingent on certain terms and conditions involving certain FDA acceptance (the "Second Payment"), certain FDA approval (the "Third Payment"), or certain sales milestones (the "Fourth Payment"). Each installment level was also contingent on payment under the prior installment level.

79. Specifically, the Second Payment provided for $20 million upon FDA acceptance of the Company's planned BLA for HAVs in urgent arterial repair following vascular trauma on or prior to March 31, 2024. The Third Payment provided for $40 million in additional funding upon FDA approval of the BLA for use of HAVs in vascular trauma on or prior to December 31, 2024 and contingent on the First and Second Payments having been paid. The Fourth Payment provided for an additional $50 million in funding upon the achievement of certain sales milestones and contingent on all the other payments having been made.

80. On December 12, 2023, the Company submitted its BLA to the FDA seeking approval for HAV for the treatment of vascular trauma.

81. Despite the Company's hopes to manufacture its HAVs at its Durham Facility, it was experiencing internal control issues and did not disclose to investors that the facility failed to

comply with certain quality assurance practices, which lead to a delayed regulatory review by the FDA for Humacyte's BLA for HAV.

**The FDA Issues a Form 483 Letter to Humacyte on April 5, 2024**

82. The FDA conducted an inspection of the Durham Facility trial site between April 1, 2024 and April 5, 2024. On the last day of the inspection, the FDA issued the Form 483 Letter to Humacyte and noted several violations at the Durham Facility.

83. Specifically, the Form 483 Letter stated, in relevant part:

> 1. There is no microbial quality assurance of the [redacted] used for the [redacted]. Specifically, there is no microbial testing or [redacted] formulated using [redacted] steps.
>
> 2. Quality oversight is inadequate for the following issues observed:
>
>    a. Investigating Out of Specification Results, SOP-0313-04, does not contain procedures for requesting an extension or opening a deviation if the investigation is not completed within the recommended 60 days. There were 10 out of 31 out-of-specifications from [redacted] that were open for more than 100 days, with the longest being open for 710 days.
>
>    b. The contract cleaning crew was not current with their [redacted] cGMP Refresher Training as required by the Training Program SOP-0315-04. Additionally, one member of the cleaning crew was not current on the GxP Cleaning Contractor Core Training "Facility Cleaning and Disinfection."
>
>    c. A complete record for the role-based training [redacted] was not available for and operator observed participating in [redacted] in [redacted] Room [redacted].
>
>    d. The quality review of the [redacted] preventive maintenance of the air handling unit was approved without the required documentation in [redacted] per Use of [redacted] SOP-0127-01 and Preventative Maintenance, SOP-0169-04.

**The Individual Defendants Issue False and Misleading Statements**

84. Through a series of communications, the Individual Defendants breached their fiduciary duties by making or authorizing materially false and misleading statements and failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that the: (i) HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies, (ii) Company did not have sufficient funds for operations without cash infusions from public offerings and contingent funding; and (iii) Individual Defendants did not fulfill their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility. Specifically, the Individual Defendants' statements about the Company's cash and cash equivalents were false and misleading because they failed to disclose that, in reality, the Company was facing liquidity crunches that would ultimately result in public offerings at share prices significantly discounted from the prevailing stock prices and that their liquidity depended on contingent funding. Furthermore, the Individual Defendants failed to disclose that due to the failures of oversight and quality assurance: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

***Second Quarter 2023 Financial Results***

85. On August 14, 2023, Humacyte issued a press release announcing its second quarter results for the period ending June 30, 2023. (Humacyte, Inc., Press Release, Humacyte Second Quarter 2023 Financial Results and Business Update (Aug. 14, 2023) (the "August 14, 2023 Press Release")). In the section titled "Second Quarter 2023 and Recent Corporate Highlights," the August 14, 2024 Press Release stated: "Clinicians reported that the rate of success in treating

patients with the HAV was high, with an observed 30-day HAV patency (presence of blood flow) of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAV."

86. Regarding the Company's liquidity, the August 14, 2023 Press Release stated:

> The Company reported cash and cash equivalents of $114.6 million as of June 30, 2023. In May 2023, Humacyte reported the completion of an up to $160 million funding arrangement with Oberland Capital Management, of which it has received $40 million. Humacyte believes that its cash and cash equivalents and expected funding from the Oberland funding agreement are adequate to fund operations past the anticipated timelines for potential FDA approval and commercialization of the HAV in the vascular trauma indication.

87. During the related earnings call (the "August 14, 2023 Earnings Call"), Niklason made the following statement about HAV's safety and efficacy and successful trial results:

> Ukrainian surgeons treating war-wounded patients with the HAV are reporting a very high success rate. At 30 days after implantation, the limb salvage in patients treated with the HAV is 100%. This is a remarkable result, especially in light of the fact that an estimated 20,000 to 50,000 war-wounded patients have lost limbs in Ukraine since the start of the conflict only 18 months ago.
>
> In addition, available data from our humanitarian aid experience indicate that the 30-day patency, or blood flow in the HAV was present in 95% of patients. Importantly, in the treatment of these wartime traumatic injuries, there were no instances of infection of the HAV.

88. Then, in response to an analyst's question about how the V017 Ukraine trial compared with prior studies, Niklason stated:

> [T]he patency results in Ukraine have been outstanding. They're actually not that different from some of the early patency results that we've talked about for V005 in some calls that we've done earlier. I would say that this is a 30-day patency rate, and it's also in relatively young[,] healthy patients. The warriors in Ukraine don't have a lot of peripheral vascular disease. So, this really allows the HAV to shine in the sense that it's being implanted into relatively healthy people with severe injuries, but relatively healthy people. And so, the 100% patency at 30 days really reflects the inherent properties of the HAV.

89. Finally, in response to another question about the benchmarking the Company was using for its V005 Phase 2/3 clinical trial, Niklason stated:

> [T]he historical control benchmark for the V005 trial is based on a comprehensive literature review. And the structure of the literature review and the meta-analysis was actually something that we agreed upon with the FDA before undertaking this. So, this is really a comprehensive review of the world's literature over the last 20 years using any type of synthetic graft. So, this means anything made out of a plastic. So, this is excluding things like CryoVein or xenografts, for example, but any synthetic graft of any type used in vascular trauma over the last 20 years. But this is also high-quality studies. . . . [T]he surgical literature is sometimes messy, and there's a lot of single-arm studies that are of low quality. Those studies were excluded with agreement from the FDA. So, we're focusing on high-quality studies. And because of that, the benchmark that we've obtained, we feel is robust and we feel will provide excellent support for eventual approval of the HAV and trauma.

90. Also during the August 14, 2023 Earnings Call, Sander made the following comments about the Company's liquidity:

> As of June 30, 2023, we had cash and cash equivalents of $114.6 million. In May 2023, we reported the completion of a funding arrangement with Oberland Capital of up to $160 million, of which we have received $40 million. We believe our cash and cash equivalents and planned funding from the Oberland funding agreement are adequate to fund operations past the anticipated timelines for approval and commercialization of the HAV in vascular trauma.

91. Additionally, in response to a question about the Company's cash burn rate, Sander added that he "would not expect more than a $40 million burn for the remainder of [2023]." He explained: "[W]e've given a sense that the Oberland transaction, combined with how we expect to operate, and also the cash on hand we expect takes us well past the approval and commercialization in vascular trauma. But from a calendar point of view, that means going to the end of 2025 at a minimum in terms of how we expect to operate."

92. On August 14, 2023, the Company filed its second quarter report on Form 10-Q with the SEC (Humacyte, Inc., Quarterly Report (Form 10-Q) (Aug. 14, 2023) (the "Q2 2023 Form 10-Q")). Niklason and Sander signed the Q2 2023 Form 10-Q. The Q2 2023 Form 10-Q also included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the filing was free from fraud, accurate, and materially complete, signed by Niklason and Sander.

93. The Q2 2023 Form 10-Q included repeated assurances that the Company had sufficient liquidity to fund its operations, including, for example:

> As of June 30, 2023, we had cash and cash equivalents of $114.6 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. We believe our cash and cash equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.

***September 12, 2023 Key Opinion Leader Webinar***

94. On September 12, 2023, the Company held a key opinion leader webinar (the "September 12, 2023 KOL Webinar"). The webinar discussed the top line data release for the V005 Phase 2/3 clinical trial. During the webinar, Dr. Shamik Parikh, Humacyte's Chief Medical Officer ("CMO") issued numerous statements about the safety and efficacy of the HAV and its promising trial results.

95. Also during the September 12, 2023 KOL Webinar, Niklason responded to a question about the V005 Phase 2/3 clinical trial data comparison, stating:

> So yes, so the historical comparator data set, I looked at the world's literature of using synthetic grafts to treat extremity vascular trauma, upper and lower extremity, over the last 20 years. We actually worked out the protocol for doing the meta analysis with the agency before we performed it. And we've already submitted the results of the meta analysis to the agency. So we have a high degree of confidence, that the agency will accept this benchmark, given that it was developed in collaboration with folks of the FDA.

96. In response to additional questions about patient follow-up results, Niklason stated:

> I would say that in terms of the decision of which conduit to use in the setting of acute injury, the caregivers are primarily interested in saving life and limb, and getting the patient out of the operating room as quickly as possible. So certainly, long-term patency is a factor. But in the setting of trauma, it is not the primary factor. The primary factor is saving life and limb at the time of the acute crisis. And this is why the FDA has acknowledged that 30-day patency is actually a salient endpoint. It's a clinically meaningful endpoint in the trauma population. So while we expect that our longer-term outcomes will be good, based on what we've seen in the PAD literature, we also believe that in the trauma population, short-term endpoints matter a lot.

97. Finally, responding to a question about the V017 Ukraine trail's composition, Niklason stated, "even though this was not a clinical trial per se, but the inclusion criteria for the humanitarian effort, actually mirrored the inclusion criteria for the V005 trial."

98. Niklason also made remarks regarding the facility and manufacturing quality and readiness during the September 12, 2023 KOL Webinar, stating:

> [O]ur manufacturing system, called the Luna200 system, which allows us to make HAVs at commercial scale, has already been in use. We've been using this system to produce vessels for our ongoing clinical trials since the middle of 2021.
>
> As part of transitioning to that commercial scale system, we did a very detailed filing to our IND with the FDA back in 2020. And they reviewed that filing and have given us a sign-off to use our current commercial system in our clinical studies.
>
> * * *
>
> [W]e're currently using systems that allow us to perform commercial scale manufacturing. And the total capacity in the building in which we now occupy, will allow us to produce approximately $1 billion worth of product, when we're fully built out.

***September 20, 2023 Live Key Opinion Leader Event***

99. On September 20, 2023, the Company held a live key opinion leader event in New York City (the "September 20, 2023 KOL Event"). At that event, Niklason stated:

> So how did we do? Well, when we look at how well blood flow was performing in the HAV after 30 days after implant, what we saw is that roughly 90% of patients had good blood flow at the 30-day endpoint. When we compare that to what's been published in the literature with synthetic grafts or plastic grafts that you can also pull off-the-shelf, that number came in around 81%, which means that our patency values were substantially better than those that have been reported for synthetic grafts, so that's already – in our view, that's already a win.
>
> If you can pull an HAV off-the-shelf or you pull a synthetic graft off-the-shelf, if you pull the HAV off-the-shelf, the patient is about half as likely to lose their blood flow. So that's – in my view, that's win #1.
>
> Win #2 is at least as important and probably more important. So if we look at the rate of amputation in patients who have injuries in their limbs, and were treated with plastic grafts off the shelf. What we see is that, that amputation rate was about

> 20%, 21%, which means 1 in 5 patients who get an injury like this who are treated with the plastic graft will go on to amputation.
>
> In our study with a lot of very sick patients, what we saw was slightly less than 10% of patients went on to amputation.
>
> * * *
>
> [W]hat I can tell you is that for every single patient in our trial, if they had an amputation, it was in the setting of the HAV working, but the patient's limb was just too badly damaged.
>
> * * *
>
> Avoiding infection, being able to resist getting infected if you're putting an HAV into a wound that has contamination. Avoiding infection is important. And what we saw is that our infection rate was only 2% in the first month and the synthetic grafts were almost 10%. So there was a more than fourfold improvement in your risk of infection.

100. Additionally, regarding the purported results of the V017 Ukraine trial, Niklason stated that: "All of these patients were viewed by the surgeons as not having any vein. So I think a lot of these patients would have had to undergo amputation if they had not had the HAV. What I can tell you is that in the 19 patients we treated, we had 0 amputations, and 100% limb salvage, and we had 0 infections."

***Third Quarter 2023 Financial Results***

101. On November 9, 2023, Humacyte issued a press release announcing its third quarter results for the period ending September 30, 2023. (Humacyte, Inc., Press Release, *Humacyte Third Quarter 2023 Financial Results and Business Update* (Nov. 9, 2023) (the "November 9, 2023 Press Release")). The November 9, 2023 Press Release announced positive HAV top line results, stating in pertinent part:

> **Positive Phase 2/3 Trauma Results** – In September 2023, Humacyte announced positive top line results from its V005 Phase 2/3 trial of the HAV in vascular trauma repair. In this single-arm clinical trial, the HAV had higher rates of patency, and lower rates of amputation and infection, compared to historic synthetic graft benchmarks. A total of 69 patients were enrolled in the V005 trial, of which 51 had

> vascular injury of the extremities and comprised the primary evaluation group for the study. The 30-day patency (presence of blood flow) for the HAV in the clinical trial was 90.2% for the extremity patients compared to approximately 81% historically reported for synthetic grafts. The HAV demonstrated lower amputation rates, with a rate of 9.8% compared to over 20% historically reported for synthetic grafts. The HAV also demonstrated lower rates of infection, with a rate of 2.0% compared to over 8% historically reported for synthetic grafts.

102. Additionally, in a section titled "Presentation of Success in Treating Wartime Injured in Ukraine," the November 9, 2023 Press Release stated, "Clinicians reported that the rate of success in treating patients with the HAV was high, with an observed 30-day HAV patency of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAV."

103. Regarding the Company's liquidity, the November 9, 2023 Press Release stated:

> The Company reported cash and cash equivalents of $100.0 million as of September 30, 2023. In May 2023, Humacyte reported the completion of a funding arrangement of up to $160 million with Oberland Capital Management, $40 million of which has been received. Total net cash used was $49.4 million for the first nine months of 2023, compared to $53.8 million for the first nine months of 2022. Humacyte believes that its cash and cash equivalents and expected funding from the Oberland arrangement are adequate to finance operations past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

104. During the related earnings call (the "November 9, 2023 Earnings Call"), Niklason made the following statements about the V005 Phase 2/3 clinical trial:

> I'll begin with our HAV program in vascular trauma and the positive top line results that we announced from our V005 Phase 2/3 clinical trial of the HAV in trauma repair. In this clinical trial, the HAV had higher rates of patency and lower rates of amputation and infection as compared to historical published benchmarks of synthetic graft function in trauma patients.
>
> A total of 69 patients were enrolled in the V005 trial, and 51 of these had vascular injury of the extremities and comprise the primary evaluation group for the study. The 30-day patency or presence of blood flow for the HAV in the clinical trial was 90% as compared to approximately 81% historically reported for synthetic graphs.
>
> Importantly, the HAV also demonstrated lower amputation rate with a rate of 9.8% for the HAV as compared to over 20% being reported historically for

> synthetic graft. This means that for avascular trauma patient receiving the HAV, the chances of amputation are less than half of the chances associated with receiving a synthetic graft.
>
> It's also important to note that in the V005 trial, there were no amputations that occurred because of failure of HAV. All of the amputations occurred because of severe injuries to the limb and not due to loss of blood flow from the HAV implant.
>
> The HAV also demonstrated lower rates of infection, with an infection rate of 2% compared to over 8% historically reported for synthetic graft. In other words, patients receiving the HAV in this trial were less than half [a]s likely to suffer an amputation, and one-fourth [a]s likely to have an infection of their graft as patients who historically got synthetic graphs for their injuries.

105. Niklason also made the following statements about V017 Ukraine trial data, stating:

> In war[-]wounded patients in Ukraine, who suffered blast and shrapnel injuries that were often severe, both a 30-day limb salvage and 30-day patient survival were 100%. [Thirty]-day patency or blood flow was 95%, and there were no reported instances of infection of the HAV.

106. Also during the November 9, 2023 Earnings Call, Sander made the following statement about the Company's liquidity:

> As of September 30, 2023, we had cash and cash equivalents of $100 million. In May 2023, we reported the completion of a funding arrangement with Oberland Capital of up to $160 million, of which we have received $40 million to date. Total net cash used was $49.4 million for the first nine months of 2023, compared to $53.8 million for the first nine months of 2022. We believe that our cash and cash equivalents and expected funding from the Oberland funding arrangement are adequate to finance operations past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

107. Also on November 9, 2023, the Company filed its third quarter report on Form 10-Q with the SEC (Humacyte, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2023) (the "Q3 2023 Form 10-Q")). Niklason and Sander signed the Q2 2023 Form 10-Q and the SOX certifications included with the filing.

108. The Q3 2023 Form 10-Q once again reiterated assurances that the Company had sufficient liquidity to fund its operations, including, for example:

> As of September 30, 2023, we had cash and cash equivalents of $100.0 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. We believe our cash and cash equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.

109. The above statements in the August 14, 2023 Press Release, the August 14, 2023 Earnings Call, the September 12, 2023 KOL Webinar, the September 20, 2023 KOL Event, the November 9, 2023 Press Release, and the November 9, 2023 Earnings Call were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies.

110. The August 14, 2023 Press Release, the Q2 2023 Form 10-Q, the November 9, 2023 Press Release, the November 9, 2023 Earnings Call, and the Q3 2023 Form 10-Q, announcing the second and third quarter 2023 financial results, were also materially false and misleading as to the Company's liquidity because Humacyte could only fund its operations through February 2024. That liquidity crunch was revealed by Humacyte's Feburary 29, 2024 announcement of an offering, which closed on March 5, 2024, of over 13 million shares at $3.00 per share – a significant discount on the prevailing stock price. The Q2 2023 Form 10-Q and the Q3 2023 Form 10-Q were also materially false and misleading as to the Company's liquidity because Humacyte would not have sufficient cash and cash equivalents to fund its operations without the funding it expected from the Oberland Funding Agreement, which was only contingently available. That was ultimately revealed by Humacyte's Q2 2024 Form 10-Q on August 13, 2024, which revealed that the PDUFA would be delayed, that Humacyte would not be able to access the contingent funds, and that, without those funds, it did not have sufficient cash and cash equivalents to fund 12 months of operations. Additionally, these Liquidity Fraud misstatements were false and

misleading because they concealed problems at the Durham Facility caused by lack of sufficient capital, as alleged in the Securities Class Action.

111. Finally, the September 12, 2023 KOL Webinar was also false and misleading because it did not disclose that the Individual Defendants were not fulfilling their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility, including that: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

***November 17, 2023 Press Release Reiterates HAV's Safety & Efficacy***

112. On November 17, 2023, Humacyte issued another press release stating that HAV was safe and effective. (Humacyte, Inc., Press Release, *Humacyte Announces Two Presentations at the VEITHsymposium® of Positive Clinical Results of the Human Acellular Vessel™ (HAV™) in the Treatment of Vascular Trauma* (Nov. 17, 2023) (the "November 17, 2023 Press Release")).

113. The November 17, 2023 Press Release reported the presentation of positive V005 Phase 2/3 clinical trial results of HAV, stating: "Results showed the HAV had higher rates of patency (blood flow), and lower rates of amputation and infection, compared to historic synthetic graft benchmarks." It continued: "[T]he comparators for the HAV results were a systematic literature review and meta-analysis of studies conducted with synthetics grafts, providing a benchmark for comparison."

114. The November 17, 2023 Press Release also stated, in pertinent part:

> The V005 trial met its objectives, and the HAV demonstrated a higher 30-day secondary patency rate of 90.2% for the extremity patients compared to 78.9% historically reported for synthetic grafts. Primary patency for the HAV was 81.2% for the extremity patients, although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark

> publications. The HAV also demonstrated lower amputation rates, with a rate of 9.8% for extremity patients compared to 24.3% historically reported for synthetic grafts. Furthermore, the HAV demonstrated lower rates of infection, with a rate of 2.0% for the extremity patients compared to 8.4% historically reported for synthetic grafts.
>
> * * *
>
> The rate of success for treatment of patients with the HAV in the V017 trial was high, with a 30-day secondary patency of 93.8%, zero amputations, and zero cases of infection of the HAV. The results of a meta-analysis combining the V005 and V017 trials concluded that the HAV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for the extremity patients compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the HAV demonstrated an improvement with a rate of 4.5% for extremity patients compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the HAV demonstrated an improvement with a rate of 0.9% for the extremity patients compared to 8.4% historically reported for synthetic grafts.
>
> * * *
>
> There were no unexpected safety signals for the HAV in the V005 and V017 studies. Common adverse events reported were anemia, vascular graft thrombosis, blood loss anemia, pyrexia, thrombocytopenia, constipation, nausea peripheral edema, and tachycardia. There were four deaths among the extremity patients in the V005 trial, and zero deaths in the V017 trial. There were no deaths among extremity patients in the V005 trial attributed to the HAV. A meta-analysis combing the V005 and V017 trials showed a rate of death for extremity patients comparable to that historically reported for synthetic grafts, with a 30-day rate for the HAV of 3.5%, and a 30-day rate of deaths attributed to the HAV of 0.0%. A 30-day rate of death of 3.4% is reported historically for synthetic grafts, although deaths attributed to the synthetic grafts were not reported.

115. Also in the November 17, 2023 Press Release, the Company issued the following remark about its manufacturing readiness: "The HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities, which are expected to have the capacity to provide thousands of vessels for treating patients in need."

116. Then, on December 12, 2023, Humacyte issued another press release, reiterating positive statements about HAV and announcing that it had submitted a BLA to the FDA for the HAV. (Humacyte, Inc., Press Release, *Humacyte Submits Biologics License Application (BLA) to*

*U.S. FDA Seeking Approval of Human Acellular Vessel™ (HAV™) for the Treatment of Vascular Trauma* (Dec. 12, 2023) (the "December 12, 2023 Press Release")). The December 12, 2023 Press Release stated in pertinent part:

> As a single-arm study, the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair. . . . The V005 trial met its objectives, and the HAV demonstrated a higher 30-day secondary patency rate of 90.2% for the patients with extremity vascular trauma compared to 78.9% historically reported for synthetic grafts. Primary patency for the HAV was 84.3% for the patients with extremity vascular trauma, although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark publications. The HAV also demonstrated lower amputation rates, with a rate of 9.8% for patients with extremity vascular trauma, compared to 24.3% historically reported for synthetic grafts. Furthermore, the HAV demonstrated lower rates of infection, with a rate of 2.0% for the V005 patients with extremity vascular trauma compared to 8.4% historically reported for synthetic grafts.
>
> * * *
>
> A high success rate for patients [from the Ukraine humanitarian program] in the V017 trial was observed, with a 30-day primary and secondary patency of 93.8%, zero amputations, and zero cases of infection of the HAV. An analysis of an integration of results from the V005 and V017 trials concluded that the HAV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for patients with extremity vascular trauma compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the HAV demonstrated an improvement, with a rate of 4.5% for integrated V005 and V017 results, compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the HAV demonstrated an improvement, with a rate of 0.9% for integrated data as compared to 8.4% historically reported for synthetic grafts.

***February 9, 2024 Press Release Reiterates HAV's Safety & Efficacy***

117. On February 9, 2024, Humacyte issued a press release stating that HAV was safe and effective. (Humacyte, Inc., Press Release, *Human Acellular Vessel™ (HAV™) Biologics License Application Granted Priority Review by U.S. FDA for the Treatment of Vascular Trauma* (Feb. 9, 2024) (the "February 9, 2024 Press Release")). The February 9, 2024 Press Release reported that the FDA had granted priority review to HAV, further touting HAV's promise:

> The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a Humanitarian Aid Program supported by the FDA. The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.

118. Additionally, the February 9, 2024 Press Release assured the public that the Company's facilities stood ready to commercially produce HAVs, stating that "[t]he HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities, which are expected to have the capacity to provide thousands of vessels for treating patients in need."

***Fourth Quarter 2023 and Year-End 2023 Financial Results***

119. On March 22, 2024, Humacyte issued a press release announcing its first quarter results for the period ending December 31, 2024. (Humacyte, Inc., Press Release, *Humacyte Fourth Quarter and Year End 2023 Financial Results and Business Update* (March 22, 2024) (the "March 22, 2024 Press Release")). Specifically, the March 22, 2024 Press Release stated, in relevant part:

> The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks in both the V005 Phase 2/3 clinical trial and the Ukraine humanitarian program.
>
> * * *
>
> These [two presentations made at the VEITH Symposium] include an expanded presentation of positive results of the V005 vascular trauma trial, with the HAV observed to have higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks.
>
> * * *
>
> The Company reported cash and cash equivalents of $80.4 million as of December 31, 2023. In addition, Humacyte completed two transactions in early 2024 which added to its cash balance. On March 5, 2024, the Company closed an underwritten public offering of its common stock and raised net proceeds of approximately $43.1 million. Furthermore, on March 11, 2024, the Company

> received $20 million in proceeds from an additional draw under its previously disclosed funding arrangement with Oberland Capital Management. Total net cash used was $69.0 million for the year ended December 31, 2023, compared to $67.7 million for the year ended December 31, 2022. Humacyte believes that its cash and cash equivalents, including net proceeds from the March offering and additional draw under the Oberland funding arrangement, will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication.

120. During the related earnings call that same day (the "March 22, 2024 Earnings Call"), Niklason made the following statements about the success of the HAV and the Company's manufacturing readiness:

> Our data package showed that the HAV had higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks. In the two trials combined, the 30-day patency or presence of blood flow for the HAV was 91.5% for extremity patients compared to 78.9% historically reported for synthetic grafts. The HAV also demonstrated lower amputation rates with a rate of 4.5% as compared to 24.3% for synthetic grafts. And furthermore, the HAV had lower infection rates at 30 days, with a rate of 0.9% as compared to 8.4% historically for synthetic grafts. In other words, patients treated with the HAV were only 40% [a]s likely to lose blood flow through their conduit after one month, which is a key period for recovery after traumatic injury. HAV patients were also only 1/5th [a]s likely to suffer an amputation and only 1/9th [a]s likely to have an infection of their graft as compared to patients who were treated with the synthetic graft.
>
> * * *
>
> [A]fter the BLA file was accepted and we got our PDUFA date in August, the FDA moved rapidly to begin scheduling interim meetings and also our inspection, which is upcoming in the near future. As far as what we've been doing to prepare for this, we've actually run two mock inspections, one last summer and one just last month in February, where we brought consultants in to Humacyte who were all ex-FDA inspectors. And they really did a deep dive on two separate occasions, really helping us be as prepared as possible for this upcoming inspection. I would say that since we began preparing for this last summer, we've really been able to execute on all of the remediations that were picked out, certainly from 2023.
>
> And we're feeling very confident about how this inspection is going to go. We believe that the facility is in great shape. Our manufacturing processes are well characterized and well understood. Obviously, with the Center for Biologics, you're right, a big focus is always on manufacturing and the facility and the robustness of the process. But we believe we're in good shape.

* * *

> [O]ne of the beauties of the platform, and this was designed with intention, is that our LUNA manufacturing machines, each of which right now can make up to about 1,000 40-centimeter HAV's per year.

* * *

> Right now, we have built out only a fraction of our manufacturing floor because we have eight LUNA's installed, although we have room for 40.

121. Also during the March 22, 2024 Earnings Call, Sander made the following statements about the Company's liquidity:

> We had cash and cash equivalents of $80.4 million as of December 31, 2023. We also completed two transactions in early 2024, which added substantially to our cash balances. On March 5, 2024, we closed an underwritten public offering of common stock and raised net proceeds of approximately $43.1 million. In addition, on March 11, 2024, we've received $20 million in proceeds from an additional draw under our revenue purchase agreement with Oberland Capital. Total net cash used was $69.0 million for the year ended December 31, 2023, compared to $67.7 million for the year ended December 31, 2022. We believe that our cash and cash equivalents are adequate to finance operations well past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

* * *

> The way we look at it is we ended December 31 with a little more than – well, right around $81 million in cash. And when we add on the $63-plus million that we achieved through the equity financing as well as the additional draw into our Oberland facility. That means we're entering the year with about $144 million in cash, which leaves us very well positioned. Our net cash burn for 2023 rounded to about $69 million. But if you back out the effect of some net financing transactions from an operating cash point of view and from a capital expenditure point of view, we've burned about $73.5 million in 2023 in those activities. So suggesting we're very well positioned with the cash that we have on hand right now.

> In terms of how we'll proceed in the upcoming year, we haven't given super specific guidance, but I'll share what we've guided in the past is that certainly, we expect to expand our commercialization activities during the year, including near the time of launch, bringing on a relatively small sales force to address this very concentrated market. So we will have, obviously, higher commercialization expenses during this year. But we do also have a wind down of certain clinical costs during the year with the V005 study just in long-term follow-up and not as intensive activities as we had during 2023 as we prepared for the close out of that

> study and for filing of the BLA. And then also our dialysis trial [V007] will be winding down in the second half of the year, too.
>
> So we expect somewhat of an increase in overall cash burn for the upcoming year, but not to a great extent on a net basis. And we believe that the cash on hand is certainly adequate to take us well past the commercial launches in trauma and AV access and well passed or certainly through 2026. So we certainly don't have any cash concerns at this point in time.

122. On March 28, 2024, the Company filed its annual report on Form 10-K with the SEC (Humacyte, Inc., Annual Report (Form 10-K) (March 28, 2024) (the "2023 Form 10-K")). Niklason and Sander signed the 2023 Form 10-K. The 2023 Form 10-K also included SOX certifications signed by Niklason and Sander.

123. The 2023 Form 10-K continued to tout HAV's strengths and safety profile:

> Overall, the HAV has functioned well and as intended, across ten different clinical trials in three clinical indications. The HAV has been implanted in approximately 573 patients, across more than 85 clinical sites in seven countries, over more than ten years (as of December 31, 2023). Rates of primary and secondary patency were similar across trial designs and disease states, with 30-day primary patency ranging from 84% – 100%. Six-month secondary patency ranges from 84% – 100%, and 12-month secondary patency ranges from 81% – 97%, across multiple clinical trials, disease states, and patient age ranges and demographics.
>
> We have observed zero instances of clinical rejection of the HAV in any clinical trial over the past ten years, suggesting that the HAV was not immunologically rejected after implantation.
>
> Based on clinical trial results to date, we have observed that the HAVs were highly resistant to infection, with an infection rate averaging approximately 1.0% per patient-year in our AV access trials, and low infection rates currently in our trauma and PAD trials.
>
> * * *
>
> The laboratory results suggest that the bioengineered human tissue of the HAV may have superior compatibility with the body's own white blood cells as compared to ePTFE.
>
> * * *
>
> **Trial Design** [for the V005 Phase 2/3 Trial for Vascular Trauma trial]: Our V005 trial is a single-arm, multi-center, non-randomized clinical trial to evaluate the efficacy, safety[,] and tolerability of our 6 millimeter HAV in replacement or

reconstruction of vascular tissues in patients with life or limb-threatening vascular trauma for whom the standard of care, saphenous vein, was not feasible or available for vascular repair. As a single-arm study, the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair. A total of 72 patients were enrolled in the V005 trial, of which 51 had vascular injury of the extremities and comprised the primary evaluation group for the study. The primary efficacy endpoint was patency of the HAV at 30 days, with 30-day rates of infection and amputation comprising the secondary endpoints.

* * *

The safety profile of the HAV in the V005 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV. A summary of adverse events for the duration of the study (mean duration of follow up is 295 days) is included in the table below.

*V005 Phase 2/3 HAV Adverse Events*

| **Adverse Event** | **V005 Trial - HAV Extremity Group (n=51) Number of Patients (%)** |
|---|---|
| Total Adverse Events | 50 (98.0%) |
| Non-Fatal Serious Adverse Events | 28 (54.9%) |
| Deaths: | |
| At Day 30 | 3 (5.9%) |
| Over Duration of Study | 4 (7.8%) |
| HAV Infections | 2 (3.9%) |
| HAV Rupture | 1 (2.0%) |
| HAV Occlusion/Thrombosis | 15 (29.4%) |
| Pseudoaneurysm | 1 (2.0%) |
| Aneurysm | 1 (2.0%) |
| Other | 2 (3.9%) |

There were no unexpected safety signals for the HAV in the V005 trial. The most common adverse events were thrombosis, anemia, pyrexia, thrombocytopenia, constipation, nausea, peripheral edema, and tachycardia. The most common non-fatal Serious Adverse Events were thrombosis, anastomotic stenosis, wound infection, muscle necrosis, wound infection, hemorrhage shock, and cardiac arrest. Deaths occurring prior to day 30 were adjudicated as not casually related to the HAV by an Independent Adjudication Committee.

* * *

A high success rate for the 16 extremity patients in the V017 [Ukraine] trial was observed, despite the presence of contaminated wound beds, as summarized in the table below.

*V017 Ukraine Humanitarian HAV Results in Vascular Trauma*

| **30-Day Endpoint** | **V017 Trial HAV Extremity Group (%)** |
|---|---|
| Primary Patency | 93.8% |
| Secondary Patency | 93.8% |
| Conduit Infections | 0.0% |
| Amputations | 0.0% |

The safety profile of the HAV in the V017 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV. A summary of adverse events for the duration of the study (mean duration of follow up is 139 days) is included in the table below.

*V017 Ukraine Humanitarian HAV Adverse Events*

| Adverse Event | V017 Trial - HAV Extremity Group (n=16) Number of Patients (%) |
|---|---|
| Total Adverse Events | 4 (25.0%) |
| Non-Fatal Serious Adverse Events | 1 (6.3%) |
| Deaths: | |
| At Day 30 | 0 (0.0%) |
| Over Duration of Study | 0 (0.0%) |
| HAV Infections | 0 (0.0%) |
| HAV Rupture* | 1 (6.3%) |
| HAV Occlusion/Thrombosis | 1 (6.3%) |
| Pseudoaneurysm | 0 (0.0%) |
| Aneurysm | 0 (0.0%) |

*One HAV rupture associated with extensive shrapnel remnants that caused bleeding.

* * *

*Combined V005 and V017 Results of HAV for Vascular Trauma*

The BLA submission is supported by the combined results from the V005 Phase 2/3 clinical trial and real-world outcomes from the treatment of wartime injuries in Ukraine in the V017 trial. Combined results included in the BLA submission to the FDA, and presented in VEITHsymposium, are summarized in the following table.

*Combined V005 Phase 2/3 HAV and V017 Ukraine Real-World Results in Vascular Trauma Compared to Synthetic Graft Benchmark*

| 30-Day Endpoint | V005 Trial HAV Extremity Group (%) | Synthetic Graft Benchmark (%) |
|---|---|---|
| Secondary Patency | 91.5% | 78.9% |
| Conduit Infections | 0.9% | 8.4% |
| Amputations | 4.5% | 24.3% |

The HAV demonstrated a higher 30-day secondary patency rate, and patients treated with the HAV were only 40% as likely to lose blood flow through their conduit after one month compared to the rate historically reported for synthetic grafts, which is a key period for recovery after traumatic injury. In addition, patients treated with the HAV had approximately 1/5 the amputation rate, and approximately 1/9 rate of infection compared to that historically reported for synthetic grafts.

124. The 2023 Form 10-K also touted the Company's manufacturing process and the Durham facility, stating:

***Our Novel Manufacturing Paradigm***

We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. Our proprietary manufacturing process was designed with a modular approach allowing us to

produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing. The manufacturing system used to supply our clinical trials from 2016 to 2021, including our Phase 3 trials conducted during that time period, utilized a single tray within one growth drawer holding ten HAVs per batch. In 2021 we commenced supplying our ongoing clinical trials with HAVs produced in our current, commercial-scale LUNA200 system, which consists of 20 growth drawers per production unit for a total of 200 HAVs per batch. Each growth drawer is capable of producing ten 42cm HAVs, each of which is contained within an individual bioreactor bag. Inside a LUNA200, a tubing network connects all HAVs, allowing the entire system to share nutritive media. In this way, a single LUNA200 can produce up to 200 HAVs (42cm in length) per batch while maintaining the critical operating parameters, such as biomechanical pulsing, that affect growth.

* * *

Our current 83,000 square foot manufacturing facility has space to further expand manufacturing capacity as needed to over 40 LUNA200 systems. Currently, eight LUNA200 systems are installed and operational.

* * *

We have designed our manufacturing system to be functionally closed, to utilize single-use disposable materials with aseptic connections, and to be fully automated, which allows us to control and maximize HAV production.

* * *

Recognizing that commercial scale production capacity of bioengineered tissue has been non-existent, we prioritized the development of a scalable, reproduceable, commercial biomanufacturing process. At our 83,000 square foot manufacturing facility in Durham, North Carolina, we have industrialized this concept and created a scalable modular manufacturing process that enables us to engineer our HAVs in commercial quantities in a system designed for cGMP compliance.

* * *

A thorough comparability assessment was performed to evaluate HAV batches produced in the single-drawer system versus batches produced in the [Company's] 20-drawer LUNA200 system. The study assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product. In this study, we observed that HAVs produced in the LUNA200 system were comparable to HAVs produced in the single-drawer system. Additionally, a crossover study, called V011, enrolled 30 subjects to evaluate HAVs that were manufactured on Humacyte's commercial LUNA200 platform with the primary goal to evaluate the safety, efficacy[,] and immunogenicity of the LUNA200-manufactured HAVs. In this trial we observed comparable safety profile between HAV used in previous

> studies and the HAV manufactured in the LUNA200 commercial system. The results of the comparability assessment and from the V011 crossover study were submitted to the FDA. In 2021, the FDA authorized the use of HAVs produced in the commercial LUNA200 system to supply our ongoing clinical trials. We plan to also use the LUNA200 system for anticipated commercial launches of the HAV if it is approved.
>
> * * *
>
> We have designed the LUNA200 to have the ability to produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline. We intend to introduce a 13cm HAV line extension after commercial launch of the 42cm HAV. Using our existing LUNA manufacturing equipment, we can generate 400 13cm HAVs per batch. Our modular manufacturing platform can be scaled without impacting the operating parameters that support the HAV growth process.
>
> * * *
>
> We currently have eight LUNA200 systems installed, commissioned[,] and qualified in our manufacturing facility, creating an annual gross HAV capacity of approximately 7,200 HAVs.

125. The 2023 Form 10-K also included repeated assurances that the Company had sufficient liquidity to fund its operations, including, for example:

> As of December 31, 2023, we had cash and cash equivalents of $80.4 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering [of 15,410,000 shares of common stock at $3.00 per share], which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement []. Based upon our current operating plan, we believe that our cash and cash equivalents will be sufficient to fund our operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K.

126. The above statements in the November 17, 2023 Press Release, the December 12, 2023 Press Release, the February 9, 2023 Press Release, the March 22, 2024 Press Release, the March 22, 2024 Earnings Call, and the 2023 Form 10-K were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies.

127. The November 17, 2023 Press Release, the February 9, 2023 Press Release, the March 22, 2024 Earnings Call, and the 2023 Form 10-K, outlined above, were also materially false and misleading as to the Company's manufacturing readiness because, despite the Company's representations suggesting or stating otherwise, the Individual Defendants were not fulfilling their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility, including that: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

128. Finally, the March 22, 2024 Press Release, the March 22, 2024 Earnings Call, and the 2023 Form 10-K were also materially false and misleading as to the Company's liquidity because Humacyte would not have sufficient cash and cash equivalents to fund its operations without the funding it expected from the Oberland Funding Agreement, which was only contingently available. That was ultimately revealed by Humacyte's Q2 2024 Form 10-Q on August 13, 2024, which revealed that the PDUFA would be delayed, that Humacyte would not be able to access the contingent funds, and that, without those funds, it did not have sufficient cash and cash equivalents to fund 12 months of operations. Additionally, these Liquidity Fraud misstatements were false and misleading because they concealed problems at the Durham Facility caused by lack of sufficient capital, as alleged in the Securities Class Action.

***The 2024 Proxy Statement***

129. On April 29, 2024, Humacyte filed a Schedule 14A with the SEC. (Humacyte, Inc., Proxy Statement (Form DEF 14A) (Apr. 29, 2024) (the "2024 Proxy Statement")). Brown, Constantino, Dougan, Green, Niklason, Pope, Sebelius, Seimetz, Wallace, and Windham-Bannister, together with two non-parties, then-directors Gordon Binder and Rajiv Shukla, solicited

the 2024 Proxy Statement. The 2024 Proxy Statement contained material misstatements and omissions.

130. The 2024 Proxy Statement asked Humacyte stockholders to vote to, among other things (1) elect Bamforth, Brown, Constantino, Jones, Niklason, and Windham-Bannister to the Board for a three-year term until the 2027 annual meeting; and (2) ratify the selection of PricewaterhouseCoopers LLP as Humacyte's independent registered public accounting firm for the fiscal year ending December 31, 2024.

131. Regarding the Company's Code of Business Conduct and Ethics, the 2024 Proxy Statement stated:

> **Code of Business Conduct and Ethics**
>
> We have adopted a Code of Conduct [] that applies to all officers, directors[,] and employees of Humacyte and its subsidiaries. The Code of Conduct [] codifies the business and ethical principles that govern all aspects of our business, reflecting our commitment to a culture of honesty, integrity[,] and accountability. In addition to following the Code of Conduct [], officers, directors[,] and employees are expected to seek guidance in situations where there is a question regarding compliance issues, whether with the letter or the spirit of our policies and applicable laws. The Code of Conduct [] is available on the investors section of our website at www.humacyte.com

132. Regarding the Audit Committee's responsibilities, the 2024 Proxy Statement stated:

> The Audit Committee has the following responsibilities, among others, as set forth in the [Audit Charter]:
>
> - selecting a firm to serve as the independent registered public accounting firm to audit our financial statements;
> - ensuring the independence of the independent registered public accounting firm;
> - discussing the scope and results of the audit with the independent registered public accounting firm and reviewing, with management and that firm, our interim and year-end operating results;

- establishing procedures for employees to anonymously submit concerns about questionable accounting or audit matters;
- considering the adequacy of our internal controls;
- reviewing material related party transactions or those that require disclosure;
- pre-approving audit and non-audit services to be performed by the independent registered public accounting firm; and
- oversee[ing] our risk management process, including with respect to cybersecurity, and our process for preventing and detecting fraud.

133. Regarding the responsibilities of the Company's Commercial Committee, the 2024 Proxy Statement stated that the Commercial Committee "oversees issues related to manufacturing, pricing, market access, and sales."

134. Regarding the Company's risk oversight, the 2024 Proxy Statement stated:

> **Risk Oversight**
>
> The Board recognizes that the leadership structure and combination or separation of the CEO and Chair roles is driven by the needs of Humacyte at any point in time. As a result, no policy exists requiring combination or separation of leadership roles, and our governing documents do not mandate a particular structure. The Board believes this structure will allow it the flexibility to establish the most appropriate structure for Humacyte at any given time.
>
> The Board oversees the risk management activities designed and implemented by our management. Management, the Board[,] and its committees work together to manage risks and the opportunities these create. The Board does not have a standing risk management committee, but rather executes its oversight responsibility both directly and through its standing committees. The Board also considers specific risk topics, including risks associated with our strategic initiatives, business plans, capital structure, commercializing our product candidates, liquidity, talent management, compliance[,] and cybersecurity. Our management, including our executive officers, are primarily responsible for managing the risks associated with the business and operations of the [C]ompany and provide appropriate updates to the Board and the Audit Committee. Our management annually reports to the Board the results of its internal survey and analysis of enterprise risk management and regularly discusses with the Board and its committees various operational and compliance risks. The Board has delegated to the Audit Committee oversight of its risk management process, and the other committees of the Board also consider risks as they perform their respective committee responsibilities. All Board committees report to the Board as

appropriate, including, but not limited to, when a matter rises to the level of a material or enterprise risk.

While management is responsible for the day-to-day risk management process, the role of the Board, either acting as the full Board or through its committees, is to ensure that:

- the risk management process designed and implemented by management is adapted to the overall corporate strategy;
- those processes are functioning effectively;
- management communicates material risks to the Board or the appropriate committee; and
- actions are being taken to continue to foster a strong culture of compliance and risk-adjusted decision making throughout Humacyte.

135. The 2024 Proxy Statement explained the Board's corporate objectives for 2023 as follows and noted that the Compensation Committee determined that "all [named executive officers] were instrumental in meeting [Humacyte's] corporate objectives." These objectives included the following:

**Corporate Objectives**

- Ensure (i) submission to the [FDA] of a [BLA] for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible, and (ii) FDA acceptance of the BLA filing.
- Advance approval of the HAV for use in arteriovenous ("AV") access for hemodialysis by, among other items, (i) reaching agreement with the FDA on a BLA filing strategy, (ii) completing enrollment of the V007 Phase 3 clinical trial[,] and (iii) reaching agreement with the FDA on the clinical trial protocol for our V012 Phase 3 clinical trial and commencing enrollment.

* * *

- Complete all necessary activities to prepare for a potential market launch of the HAV in the vascular trauma indication.
- Maintain financial stability through strong adherence to budget, by managing and expanding capital and enhancing access to lending.

136. The 2024 Proxy Statement was materially misleading because it failed to disclose that: (i) although Humacyte claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants were violating the Code of Conduct; (ii) contrary to the 2024 Proxy Statement's representation that the named executive officers had met the Company's corporate objectives in 2023 regarding the HAV's regulatory submissions and product approval, readiness for HAV market launch, financial stability, in reality, the named executive officers had not satisfied these corporate objectives; and (iii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Humacyte to issue false and misleading statements.

137. The 2024 Proxy was also materially misleading because it failed to disclose to investors, *inter alia*, that (i) the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies, (ii) the Company did not have sufficient funds for operations without cash infusions from public offerings and contingent funding; and (iii) the Individual Defendants did not fulfill their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility. Specifically, the Individual Defendants' statements about the Company's cash and cash equivalents were false and misleading because they failed to disclose that, in reality, the Company was facing liquidity crunches that would ultimately result in public offerings at share prices significantly discounted from the prevailing stock prices and that their liquidity depended on contingent funding. Furthermore, the Individual Defendants failed to disclose that due to the failures of oversight and quality assurance: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be

delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

***First Quarter 2024 Financial Results***

138. On May 10, 2024, Humacyte issued a press release announcing its first quarter results for the period ending March 31, 2024. (Humacyte, Inc., Press Release, *Humacyte First Quarter 2024 Financial Results and Business Update* (May 10, 2024) (the "May 10, 2024 Press Release")). The May 10, 2024 Press Release quoted Niklason as claiming, among other things, that the Company was "on track with [its] BLA review and commercial launch preparations and remain[ed] confident in the approvability of the HAV in vascular trauma." Specifically, the May 10, 2024 Press Release stated, in relevant part:

> **Humacyte First Quarter 2024 Financial Results and Business Update**
>
> *-Biologics License Application (BLA) for HAV™ Accepted by FDA-*
>
> *-BLA Granted Priority Review for Vascular Trauma Indication; PDUFA date set for August 10, 2024-*
>
> *-Raised approximately $43 million in net proceeds from public offering of common stock-*
>
> * * *
>
> "During the first quarter of 2024, we achieved a major milestone with the acceptance by the [FDA] of our [BLA] seeking approval of the HAV in the vascular trauma indication," said [Niklason, Humacyte's CEO]. "The FDA's decision to grant Priority Review sets a [PDUFA] date of August 10, 2024, and the entire Humacyte team is working to support our planned U.S. market launch. Among our recent accomplishments is the completion of a Budget Impact Model illustrating the potential economic value of the HAV compared to current standard of care in vascular trauma. In addition, the FDA completed its Pre-Licensing Inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations and remain confident in the approvability of the HAV in vascular trauma."
>
> * * *

> In February 2024, the FDA accepted and granted Priority Review to Humacyte's BLA seeking approval of the HAV in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use not feasible. The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. The HAV was observed to have higher rates of patency, or blood flow, and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.

139. The May 10, 2024 Press Release also assured investors of the Company's liquidity:

> The Company reported cash and cash equivalents of $115.5 million as of March 31, 2024. Total net cash provided was $35.1 million for the first three months of 2024, compared to net cash used of $20.2 million for the first three months of 2023. The increase in net cash provided resulted primarily from the receipt of approximately $43.0 million in net proceeds from an underwritten public offering of Humacyte's common stock in March 2024, and $20 million in proceeds from an additional draw under its previously disclosed funding arrangement with Oberland Capital Management. Humacyte believes that its cash and cash equivalents will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication.

140. During the related earnings call (the "May 10, 2024 Earnings Call"), Niklason commented on the Company's progress regarding its HAV BLA submission to the FDA and assured investors that the "FDA ha[d] completed its pre-licensing inspection of [its] manufacturing facilities in Durham, North Carolina as part of the BLA review process" and that Humacyte "remain[ed] on track with [its] BLA review and commercial launch preparations, and [it] remain[ed] confident in the approvability of the HAV in vascular trauma." Specifically, Niklason stated, in relevant part:

> I'll begin with our HAV program in vascular trauma. You'll recall that in December of 2023, we submitted our BLA to the FDA. During our last quarterly call, we discussed in detail the robust data package supporting our submission, which included positive results from our V005 Phase 2/3 clinical trial as well as real-world evidence from the treatment of wartime injuries in Ukraine under the humanitarian aid program that was supported by the FDA.
>
> In February of 2024[,] the FDA accepted our BLA in vascular trauma, granting Priority Review and establishing a PDUFA goal date for action of August 10th. The FDA has completed its pre-licensing inspection of our manufacturing facilities

> in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations, and we remain confident in the approvability of the HAV in vascular trauma.
>
> * * *
>
> Based on the strength of our BLA data package, combined with our Priority Review and the RMAT designation from the FDA, we're looking forward to the PDUFA date.

141. During the same call, an analyst asked if the Company could "talk about the facility inspection with FDA." Specifically, the analyst asked: "Any observations? Anything [the Company] had to correct? How clean was that?" In response, Prichard, who oversaw the inspection, stated, in relevant part:

> [W]e completed our pre-license inspection of our manufacturing facility and had a very successful outcome. And based on the outcome of inspection and all of the other FDA interactions on the whole, we remain very confident in approval of the HAV in vascular trauma. And we won't necessarily comment on any single interaction or the details, but we do feel very confident. And it was a very successful interaction that we have with the FDA, and we feel like it concluded very successfully.
>
> * * *
>
> [A]s our manufacturing capacity stands now, as you know, at about 8,000 HAVs growth per year. And as far as scaling that out with the LUNA system that we have that manufactures our product, that is just a case of putting in more LUNA lines. Our facility is already ready in a shelled out space that's already plumbed for electrical and gases and utilities for us to add additional units LUNAs up to about 40,000 HAVs per year annual gross yield.
>
> So we're prepared, and we're prepared for a launch to be able to produce enough vessels in the first few years. And then we're also prepared and have begun planning for that expansion within the space. So as demand grows, we can produce enough HAVs for the market.

142. Also during that call, Niklason assured investors that the FDA had "already completed the inspection of our facility" and "things are tracking along exactly as we would have expected," indicating that "[e]verything just seems to be progressing along as we would have expected" and that the Company had "no indication that [it was] not on track." Specifically, in

response to a question regarding the Company's interactions with the FDA, Niklason stated, in relevant part:

> Well, as with any BLA filing, part of the standard procedure is that after you file and after they accept the file, there is a lot of back and forth that they ask for clarifying. They ask clarifying questions. They ask for additional information. And that's been going on, frankly, since January. And those interactions have been going very smoothly, and we've been able to address all of the questions that they've been asking. There are also specific meetings that are part of the normal process, there's what's called a mid-cycle meeting, which we've already completed.
>
> So I think that – and as we mentioned, we've already completed the inspection of our facility. So things are tracking along exactly as we would have expected, given the timelines for a Priority Review. So again, we see no reason that the PDUFA date will shift. Of course, what – exactly what the FDA does is always out of our control, but we have no indication that we're not on track. Everything just seems to be progressing along as we would have expected.

143. Finally, also during that same earnings call, Sander made the following remarks about the Company's liquidity:

> As of March 31, 2024, we had cash and cash equivalents of $115.5 million. Total net cash provided was $35.1 million for the first three months of 2024 compared to net cash used of $20.2 million for the first three months of 2023. The increase in net cash provided resulted primarily from $43 million in net proceeds from a public offering of Humacyte's common stock in March 2024 and $20 million in proceeds from an additional draw under our funding arrangement with Oberland Capital Management. We believe that our cash and cash equivalents will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

***May 13, 2024 Quarterly Report***

144. On May 13, 2024, the Company filed its first quarter report on Form 10-Q with the SEC (Humacyte, Inc., Quarterly Report (Form 10-Q) (May 13, 2024) (the "Q1 2024 Form 10-Q")). Niklason and Sander signed the Q1 2024 Form 10-Q. The Q1 2024 Form 10-Q also included SOX certifications signed by Niklason and Sander.

145. The Q1 2024 Form 10-Q purported to warn investors of the risks the Company faced when those risks had already materialized. The Q1 2024 Form 10-Q included the following "numerous risks and uncertainties associated with the development of [the Company's] products":

> • the timing, receipt[,] and terms of any marketing approvals from applicable regulatory authorities including the FDA and non-U.S. regulators;
>
> *   *   *
>
> • development of clinical and commercial manufacturing capabilities or making arrangements with third-party manufacturers in order to ensure that it or its third-party manufacturers are able to successfully manufacture our product;

146. The Q1 2024 Form 10-Q then stated:

> A change in the outcome of any of these variables could lead to significant changes in the costs and timing associated with the development of our product candidates. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we currently anticipate being required to conduct in order to complete the clinical development of any of our product candidates, or if we experience significant delays in the enrollment or the conduct of any of our clinical trials, we could be required to expend significant additional financial resources and time on the completion of clinical development.

147. The Q1 2024 Form 10-Q purported to describe the relevant overview of the Company's operations and the progress of the Company's BLA for ATEV. Specifically, the Q1 2024 Form 10-Q stated, in relevant part:

> In September 2023, we announced positive topline results from our V005 Phase 2/3 trial in vascular trauma, and in December 2023, we filed a BLA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible. In February 2024, the FDA accepted the BLA filing and granted priority review and set a [PDUFA] date of August 10, 2024.

148. Finally, the Q1 2024 Form 10-Q made the following, repeated statements about Humacyte's liquidity:

> The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these interim financial statements.

* * *

> As of March 31, 2024 and December 31, 2023, we had an accumulated deficit of $569.2 million and $537.3million, respectively, and working capital of $103.8 million and $64.8 million, respectively. Our operating losses were approximately$26.6 million and $22.5 million for the three months ended March 31, 2024 and 2023, respectively.

* * *

> As of March 31, 2024, we had cash and cash equivalents of $115.5 million. We believe our cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Quarterly Report.

149. The above statements in the May 10, 2024 Press Release, the May 10, 2024 Earnings Call, and the Q1 2024 Form 10-Q were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies.

150. The above statements identified in the May 10, 2024 Press Release, the May 10, 2024 Earnings Call, and the Q1 2024 Form 10-Q, outlined above, were also materially false and misleading as to the Company's manufacturing readiness because, despite the Company's representations suggesting or stating otherwise, the Individual Defendants were not fulfilling their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility, including that: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

151. Finally, the above statements in the May 10, 2024 Press Release and the May 10, 2024 Earnings Call were false and misleading as to the Company's liquidity because

Humacyte would not have sufficient cash and cash equivalents to fund its operations without the funding it expected from the Oberland Funding Agreement, which was only contingently available. That was ultimately revealed by Humacyte's Q2 2024 Form 10-Q on August 13, 2024, which revealed that the PDUFA would be delayed, that Humacyte would not be able to access the contingent funds, and that, without those funds, it did not have sufficient cash and cash equivalents to fund 12 months of operations. Additionally, these Liquidity Fraud misstatements were false and misleading because they concealed problems at the Durham Facility caused by lack of sufficient capital, as alleged in the Securities Class Action.

***June 6, 2024 Jeffries Global Healthcare Conference***

152. On June 6, 2024, Humacyte presented at the Jefferies Global Healthcare Conference ("Jefferies Conference."). During the presentation, Niklason stated:

> [S]urgeons in Ukraine treated a total of 19 patients over a yearlong humanitarian effort, and you can see the outcomes there. Out of those patients, 94% retained blood flow through the graft after a month, which was our primary endpoint. But in addition, none of those patients suffered amputation and none of those patients suffered infection of their vascular conduit. And that was an impressive result…Okay. So the patency number's about 91.5% at 30 days, and that compared well to 79% with synthetic grafts. But probably more importantly, the infection rate with our vessels was only about one-ninth the infection rate of synthetic grafts. This was not surprising to us based on what we knew about our product. And lastly and most importantly, the risk of amputation was about one-fifth. So historically, if you were a patient who had an extremity wound and you got a plastic graft to restore blood flow, you had about a one in four chance of having that limb amputated. In our case, if they got our vessel, you had a 1 in 20 chance of having your limb amputated. So these are the data that really provided the undergird of the BLA filing that went in, in December.
>
> * * *
>
> So as I mentioned, we filed in December. The BLA package was accepted by the FDA in February. As we let investors know in our May quarterly earnings call, we completed an inspection of our facility by the FDA in April, and we've been continuing to march through our interactions with the FDA and we look forward with enthusiasm to our August 10 PDUFA date.

***June 17, 2024 Press Release Touts Manufacturing Readiness***

153. On June 17, 2024, Humacyte issued a press release stating that its manufacturing facilities were ready and capable. (Humacyte, Inc., Press Release, *Centers for Medicare & Medicaid Services (CMS) Issues ICD-10-PCS Codes for Humacyte's Human Acellular Vessel™ (HAV™)* (June 17, 2024) (the "June 17, 2024 Press Release")). The June 17, 2024 Press Release claimed: "The [C]ompany's manufacturing facilities are capable of producing ATEVs at commercial scale to meet the potential needs of thousands of patients."

154. The above statements made at the Jefferies Conference and the June 17, 2024 Press Release were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies.

155. The above statements made at the Jefferies Conference and the June 17, 2024 Press Release, outlined above, were also materially false and misleading as to the Company's manufacturing readiness because, despite the Company's representations suggesting or stating otherwise, the Individual Defendants were not fulfilling their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility, including that: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

**The Truth Begins to Emerge**

***August 9, 2024 Press Release***

156. Investors began to learn the truth on August 9, 2024, when Humacyte issued a press release announcing that the FDA required more time to review the Company's BLA but that based on interactions with the FDA, Humacyte was confident "in the approvability of the ATEV in

treating vascular trauma." (Humacyte, Inc., Press Release, *Humacyte Announces FDA Communication of Additional Time Required to Complete Review of acellular tissue engineered vessel (ATEVTM) BLA for the Treatment of Vascular Trauma* (Aug. 9, 2024) (the "August 9, 2024 Press Release")). Regarding the safety and efficacy of the HAV, the August 9, 2024 Press Release stated, in pertinent part:

> Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. ATEV was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat war injuries. In both the civilian and military clinical studies, ATEV was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.

157. Additionally, regarding the Company's manufacturing readiness, the August 9, 2024 Press Release stated:

> Humacyte, Inc. (Nasdaq: HUMA), a clinical-stage biotechnology platform company developing universally implantable, bioengineered human tissues at commercial scale, today announced that the [FDA] will require additional time to complete its review of its [BLA] for the acellular tissue engineered vessel (ATEV) in the vascular trauma indication. The ATEV trauma program BLA was submitted to FDA in December 2023, and the FDA granted a Priority Review in February 2024 and assigned a PDUFA date of August 10, 2024. In a phone call from FDA CBER leadership today, the Company was informed that the FDA required additional time to complete its review.
>
> "We received a call from FDA CBER leadership this afternoon apologizing to us and stating that additional time was required for review." said [Niklason, Humacyte's CEO]. "FDA leadership noted that Humacyte's ATEV is a first-in-class product, and that Priority Review had been granted, which allows only a six-month review cycle, as compared to the standard ten-month review cycle for most products. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma. The FDA leadership

expressed an apology for their inability to complete the review by the PDUFA date, and currently we do not yet have a revised action date.[5]

158. As these excerpts show, while the August 9, 2024 Press Release announced the delay in the FDA's review of the BLA, it simultaneously failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies and by downplaying the delays insisting that the Company remained "confident in the approvability of the ATEV in treating vascular trauma."

159. The above statements in the August 9, 2024 Press Release were also materially false and misleading as to the Company's manufacturing readiness because, despite the Company's representations suggesting positive facility inspection interactions, the Individual Defendants were not fulfilling their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility, including that: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

160. On the news of the delay, the Company's stock price declined approximately $1.30, or 16.4%, to close at $6.62 per share on August 12, 2024, on unusually heavy volume.

---

[5] The Center for Biologics Evaluation and Research ("CBER") is the center within the FDA that regulates biological products for human use under applicable federal laws, including the Public Health Service Act and the Federal Food, Drug, and Cosmetic Act ("FD&C Act"). CBER protects and advances the public health by ensuring that biological products are safe and effective and available to those who need them. CBER also provides the public with information to promote the safe and appropriate use of biological products.

***Second Quarter 2024 Financial Results***

161. On August 13, 2024, Humacyte issued a press release announcing its second quarter 2024 financial results for the period ending June 30, 2024. (Humacyte, Inc., Press Release, *Humacyte Second Quarter 2024 Financial Results and Business Update* (Aug. 13, 2024) (the "August 13, 2024 Press Release")). The August 13, 2024 Press Release touted that the "FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing" and these interactions led the Company to be "confident in the approvability of the ATEV in treating vascular trauma." The August 13, 2024 Press Release stated, in relevant part:

> "We were surprised to be notified by the FDA that they will require additional time to complete their review of the BLA for [Humacyte's] ATEV (acellular tissue engineered vessel) in vascular trauma," said [Niklason, Humacyte's CEO]. "FDA leadership noted that Humacyte's ATEV is a first-in-class product, and that Priority Review had been granted, which involves only a six-month review cycle, as compared to the standard ten-month review cycle for most products. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma, although we currently do not yet have a revised action date."
>
> * * *
>
> On August 9, 2024, in a phone call, [CBER] leadership from the [FDA] notified the Company that the FDA will require additional time to complete its review of the [BLA] for the ATEV in the vascular trauma indication. The ATEV trauma BLA was submitted to FDA in December 2023, FDA granted a Priority Review in February 2024, and assigned a PDUFA date of August 10, 2024.

162. The Company also held a related earnings call that same day (the "August 13, 2024 Earnings Call"). During that call, an analyst asked, "if FDA does communicate with [Humacyte], . . . should we expect a new date for clearance, or will it simply provide a clearance at a future date. . . ." In response, Niklason stated, "I wish I could provide more clarity for this

group, but I can't. Again, the phone call from the senior leadership at CBER on Friday said simply that they need more time and they did not give us insight into a new date or how we would be informed." Sanders followed up, adding, "I think [to] extrapolate from what [Niklason] said, we don't know what the delay will be at this instance[.]"

163. Also during that call, Niklason made the following statements regarding the Company's manufacturing readiness:

> Despite the FDA's delay, I want to emphasize that we remain confident in the approvability of the ATEV in vascular trauma based on our interactions with the agency to date. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and our clinical sites. They've also actively engaged with us in multiple discussions regarding the BLA filing, including post-approval marketing and labeling discussions.
>
> * * *
>
> So we had a total of five inspections. I would say all of those inspections went very well. In terms of follow-up items, there are – there's a small number of standard follow-up items on assays and CMC having to do with validation of certain methods. But these are sort of standard things that we've worked out with the agency. Some of those were completed pre-PDUFA. Some of those were slated for post-PDUFA. For example, one study is shipping the product during winter, and we couldn't do that until winter, so we agreed to do that in winter. So but these are sort of standard, I don't want to say cookie cutter, but these are standard validation and test procedures that we do not believe are impacting the timing of the file.

164. On August 13, 2024, the Company also filed its second quarter report on Form 10-Q with the SEC for the period ending June 30, 2024 (Humacyte, Inc., Quarterly Report (Form 10-Q) (Aug. 13, 2024) (the "Q2 2024 Form 10-Q")). Niklason and Sander signed the Q2 2024 Form 10-Q. The Q2 2024 Form 10-Q included SOX certifications signed by Niklason and Sander.

165. The Q2 2024 Form 10-Q repeated the risks the Company disclosed on its Q1 2024 Form 10-Q, ¶ 144 *et seq.*, *supra*, purporting to warn investors of the risks the Company faced when those risks had already materialized. The Q2 2024 Form 10-Q included the following "numerous risks and uncertainties associated with the development of [the Company's] products":

> • the timing, receipt[,] and terms of any marketing approvals from applicable regulatory authorities including the FDA and non-U.S. regulators;
>
> * * *
>
> • development of clinical and commercial manufacturing capabilities or making arrangements with third-party manufacturers in order to ensure that it or its third-party manufacturers are able to successfully manufacture our product[.]

166. The Q1 2024 Form 10-Q also stated:

> A change in the outcome of any of these variables could lead to significant changes in the costs and timing associated with the development of our product candidates. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we currently anticipate being required to conduct in order to complete the clinical development of any of our product candidates, or if we experience significant delays in the enrollment or the conduct of any of our clinical trials, we could be required to expend significant additional financial resources and time on the completion of clinical development.

167. Similarly, the Q2 2024 Form 10-Q repeated the statements referenced in its Q1 2024 Form 10-Q, ¶ 144 *et seq.*, *supra*, purporting to describe an overview of the Company's operations and the progress of the Company's BLA for ATEV and purportedly hypothetical manufacturing risks. The Q2 2024 Form 10-Q also stated, in relevant part:

> We are initially using our proprietary, scientific technology platform to engineer and manufacture ATEVs. Our investigational ATEVs are designed to be easily implanted into any patient without inducing a foreign body response or leading to immune rejection. We are developing a portfolio, or "cabinet", of ATEVs with varying diameters and lengths.
>
> * * *
>
> In September 2023, we announced positive topline results from our V005 Phase 2/3 trial in vascular trauma, and in December 2023, we filed a BLA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible. In February 2024, the FDA accepted the BLA filing and granted priority review and set a [PDUFA] date of August 10, 2024. On August 9, 2024, the FDA informed us that it required additional time to complete its review of the BLA for the vascular trauma indication.

168. The above statements in the August 9, 2024 Press Release, August 13, 2024 Press Release, the August 13, 2024 Earnings Call, and the Q2 2024 Form 10-Q were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies.

169. The August 9, 2024 Press Release, the August 13, 2024 Press Release, the August 13, 2024 Earnings Call, and the Q2 2024 Form 10-Q were also false and misleading because they did not disclose that Individual Defendants were not fulfilling their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility, including that: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

***Liquidity News Hits the Market***

170. The Q2 2024 Form 10-Q revealed that, contrary to prior indications, the Company did not have sufficient liquid capital for its commercial operations:

> As of June 30, 2024, we had cash and cash equivalents of $93.6 million. The extension of time required by the FDA to review our vascular trauma BLA, and the delay in potential approval, has delayed, among other items, our ability to draw an additional $40.0 million in Purchase Agreement proceeds. Accordingly, we do not believe our available cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least one year from the date of this Quarterly Report without achieving approval of the ATEV for vascular trauma and generating sufficient cash flows from commercial sales on a timely basis and/or obtaining additional capital.

171. The Q2 2024 Form 10-Q also noted, for the first time, that Humacyte's liquidity situation "raised substantial doubt about our ability to continue as a going concern. We will, over the course of the next year, require additional financing to continue our operations."

172. The Q2 2024 Form 10-Q ultimately revealed that the PDUFA would be delayed, that Humacyte would not be able to access the contingent funds, and that, without those funds, it did not have sufficient cash and cash equivalents to fund 12 months of operations.

173. On this news, Humacyte stock's closing price dropped from $6.65 per share on August 13, 2024 to $6.01 per share on August 14, 2024 – a 9.62% decrease.

174. Then, on September 24, 2024, the Company filed a Form 8-K current report with the SEC, signed by Sander (Humacyte, Inc., Current Report (Form 8-K) (Sept. 24, 2024) (the "September 24, 2024 Form 8-K")). The September 24, 2024 Form 8-K announced that Humacyte had entered into a purchase agreement and a registration rights agreement with Lincoln Park Capital Fund, LLC ("Lincoln Park"). The agreements allowed Humacyte to, in its sole discretion, sell Lincoln Park "shares of the Company's common stock . . . having an aggregate value of up to $50,000,000." The agreements also granted Humacyte the right to require Lincoln Park to purchase new Humacyte shares (subject to a daily maximum) at a 3% discount off either the lesser of the lowest sale price on the purchase date or the average of the three lowest closing sale prices in the 10 days preceding.

175. On this news, Humacyte stock's closing price dropped from $6.12 per share on September 24, 2024 to $5.46 per share on September 25, 2024 – a 10.78% decrease.

176. The foregoing misstatements and liquidity revelations were also interspersed with other partial, corrective revelations. The most notable was the release of the FDA Form 483 Letter. Specifically, on October 17, 2024, during market hours, the FDA released the Form 483 Letter. The Form 483 Letter revealed that during an inspection done by the FDA between April 1 and April 5, 2024, the FDA found a number of violations to the FD&C Act. The Form 483 Letter

revealed that the Durham Facility did not have "microbial assurance" or "microbial testing" and thus had inadequate oversight of quality assurance.

177. On this news, the Company's stock price declined $0.95, or 16.35%, to close at $4.86 per share on October 17, 2024, on unusually heavy volume.

***Third Quarter 2024 Financial Results***

178. On November 8, 2024, Humacyte issued a press release announcing its third quarter 2024 financial results for the period ending September 30, 2024. (Humacyte, Inc., Press Release, *Humacyte Third Quarter 2024 Financial Results and Business Update* (Nov. 8, 2024) (the "November 8, 2024 Press Release")). The November 8, 2024 Press Release quoted Niklason as saying, "Our [BLA] for our ATEV in vascular trauma remains under review by the [FDA]," and "FDA leadership has not provided us a timeline for the completion of their review. As noted in our previous announcements, during the course of the BLA review the FDA conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. Based on these interactions, we remain confident in the approvability of the ATEV in treating vascular trauma." The press release also stated:

> On August 9, 2024, in a phone call, [CBER] leadership from the FDA notified Humacyte that the FDA will require additional time to complete its review of the Company's BLA for the ATEV in the vascular trauma indication. The ATEV trauma BLA was submitted to FDA in December 2023. [The] FDA granted a Priority Review in February 2024, and assigned an original PDUFA date of August 10, 2024. The FDA has not provided a timeline for the completion of their review.

179. The Company also held a related earnings call that same day (the "November 8, 2024 Earnings Call"). During that call, Niklason again discussed the FDA's delay but omitted discussion about the safety concerns of the FDA's external reviewers, stating:

> During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and our clinical trial sites. They've also actively engaged

> with us in multiple discussions regarding our BLA filing, including agreement on post-marketing commitments as well as labeling discussions.
>
> We continue to maintain confidence in the approvability of the ATEV in vascular trauma based upon our interactions with the agency to date.

180. Additionally, in response to a question about the PDUFA delay, Niklason answered:

> So, since the PDUFA date, and when the FDA told us they needed more time, we've since had occasional what I'm calling pinging.
>
> We reach out to the CBER leadership every few weeks and ask them, offer them material that may help in the review, ask them if they have timelines or questions for us. And we have offered additional material, for example, some of the webinars that we've shown that they've accepted.
>
> But they have not given us a new date, and they have not really engaged in much question asking. I will say that we've gotten a couple requests for sort of standard documentation on the CMC side just in the last couple weeks that our quality team and our CMC team are responding too timely.
>
> But it would be too far to say that we're having substantive discussions with them. We are offering them the material, and they've asked us a couple of paperwork questions.

181. The above statements in the November 8, 2024 Press Release and the November 8, 2024 Earnings Call were false and misleading because, *inter alia*, even while acknowledging delay, they failed to disclose to investors that the HAV had serious health and safety issues, such as the issues flagged by FDA external reviewers.

***November 14, 2024 Press Release Announcing Another Offering***

182. On November 14, 2024, Humacyte issued a press release, fulling and finally revealing the extent of the Liquidity Fraud – but still failing to reveal the Company's ongoing Product Safety Fraud and Facility Fraud. (Humacyte, Inc., Press Release, *Humacyte Announces Pricing of $15.0 Million Registered Direct Offering* (Nov, 14, 2024) (the "November 14, 2024

Press Release")). The November 14, 2024 Press Release announced a $15 million registered direct offering.

183. In the corresponding prospectus supplement, the Company stated that it "intend[ed] to use the net proceeds from this offering to fund the development of the product candidates in our pipeline, the planned commercial launch of the ATEV in the vascular trauma indication, if approved, and for working capital and general corporate purposes."

184. On this news, Humacyte stock's closing price dropped from $5.34 per share at close on November 13, 2024 to $4.84 per share on November 14, 2024, – a 9.36% decrease.

***November 21, 2024 Press Release Touts the Benefits of HAV***

185. On November 21, 2024, Humacyte issued a press release touting the benefits of HAV. (Humacyte, Inc., Press Release, *Humacyte Clinical Results Highlighting Benefit of the ATEV™ in the Repair of Civilian and Military Arterial Injuries Published in JAMA Surgery* (Nov, 21, 2024) (the "November 21, 2024 Press Release")). The November 21, 2024 Press Release announced Humacyte's clinical results being published in *JAMA Surgery* in an article titled "Bioengineered Human Arteries for the Repair of Vascular Injuries" – an article that listed both Niklason and Humacyte's CMO, Dr. Parikh as contributing authors who "had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis."

186. The November 21, 2024 Press Release describes two clinical studies about the HAV, noting:

> The *JAMA Surgery* publication described the results of two studies in which the ATEV was evaluated in patients with extremity vascular trauma. The V005 clinical trial was a single-arm study conducted in the United States and Israel in patients with arterial injuries resulting from gun shots, workplace injuries, car accidents, or other traumatic events for whom the standard of care, saphenous vein, was not feasible or available to use as a bypass graft. The V017 single-arm clinical trial evaluated patient outcomes from a humanitarian program which patients with

> wartime injuries were treated in Ukraine. As single-arm studies, the comparators for the ATEV results were a systematic literature review and meta-analysis of studies conducted with synthetics grafts, providing a current treatment benchmark comparison. In a meta-analysis combining the V005 and V017 trials, the ATEV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for the extremity patients compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the ATEV demonstrated an improvement with a rate of 4.5% for extremity patients compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the ATEV demonstrated an improvement with a reduced rate of 0.9% for the extremity patients compared to 8.4% historically reported for synthetic grafts. In summary, researchers concluded that the 30-day outcomes in civilian and military trauma patients indicate superior secondary patency, limb salvage, and resistance to infection of the ATEV conduit compared to synthetic grafts.
>
> * * *
>
> Also published were longer-term follow-up results from the V005 and V017 studies. The ATEV was observed to be mechanically durable and does not appear to dilate or become stenotic over time. Long-term outcomes for secondary patency, limb salvage, freedom from conduit infection, and patient survival were evaluated by Kaplan-Meier analysis. The average follow-up duration for patients receiving the ATEV for extremity trauma is 334.4 days, with a total patient exposure of 61.3 years. These results showcased the potential of the ATEV to retain patency over the longer duration of follow up. No ATEV infections or patient deaths were reported after month three.
>
> * * *
>
> Evaluation of the safety of the ATEV indicated no safety signals attributable to ATEV mechanical weakness, contamination, or immune rejection. Overall, Adverse Events (AEs) and Serious Adverse Events (SAEs) were consistent with patients suffering from acute injuries. Adverse Events of Special Interest (AESIs) including thrombosis, rupture, aneurysm, and pseudoaneurysm, occurred at rates that were consistent with reports of other vascular conduits, including autologous vein and synthetic grafts. The meta-analysis combing the V005 and V017 trials showed a 30-day rate of death in ATEV patients of 3.5%, comparable to the 3.4% rate historically reported for synthetic grafts. There were no deaths attributable to the ATEV.

187. The above statements in the November 21, 2024 Press Release were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the flaws in the studies.

***December 19, 2024 Press Release Announces Approval of SYMVESS – but Omits the Restrictive Scope of the Approval and Additional Requirements***

188. On December 19, 2024, Humacyte issued a press release touting the benefits of the HAV. (Humacyte, Inc., Press Release, *Humacyte Announces FDA Approval of SYMVESS™ (acellular tissue engineered vessel-tyod) for the Treatment of Extremity Vascular Trauma* (Dec. 19, 2024) (the "December 19, 2024 Press Release")). The December 19, 2024 Press Release stated in relevant part:

> [Humacyte] today announced that the [FDA] has granted a full approval for SYMVESS (acellular tissue engineered vessel-tyod) for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and when autologous vein graft is not feasible.
>
> * * *
>
> SYMVESS, or the ATEV™, is a first-in-class bioengineered human tissue that is designed to be a universally implantable vascular conduit for use in arterial replacement and repair. While harvesting vein from a trauma patient takes valuable surgical time, SYMVESS is available off-the-shelf, and does not require further injuring the patient to obtain vascular repair material. Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. SYMVESS was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds, and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat wartime injuries. Results from these studies were published in *JAMA Surgery* on November 20, 2024. In the civilian and military clinical studies, SYMVESS was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.

189. The December 19, 2024 Press Release also quoted Niklason as saying, "SYMVESS approval in this first indication for arterial injury repair is a milestone for regenerative medicine overall, as well as for Humacyte. The FDA's full approval of SYMVESS is a transformational event for the Company and our bioengineering technology platform."

190. The above statements in the December 19, 2024 Press Release were false and misleading because they failed to disclose to investors that the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies.

191. Specifically, the December 19, 2024 Press Release painted the approval as a wholesale success. It did not mention that the Company's initial BLA sought broader approval for the HAV, now Symvess, specifically for use "in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible." The final approved indication was much narrower than sought and covered only "use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible."

192. Additionally, the December 19, 2024 Press Release did not mention any of the unusual post-marketing requirements and commitments beyond standard practice tied to the FDA's approval. For example, these included (i) prohibiting distribution on a product lot without a specific CBER release notification; (ii) expediting reporting of graft rupture for three years; (iii) deferring pediatric study with final protocol and report deadlines included; (iv) a long-term observational study on the risks of skin graft failure; (v) final report deadline for treating life- or limb-threatening vascular trauma by December 31, 2026; (vi) a PMC shipping validation study to evaluate critical quality attributes of the HAV; (vii) an 18-month PMC leachables study to assess potential contaminants; and (viii) establishment and justification of updated acceptance criteria for product release. Together, these requirements and commitments underscored the FDA's continued regulatory concerns about the HAV product and quality assurance.

**The Truth Is Fully Revealed**

***The March 24, 2025 NYT Exposé***

193. On March 24, 2025, *The New York Times* published the *NYT* exposé. The *NYT* exposé revealed that certain FDA staff members found one of Humacyte's HAV studies "severely lacking." The *NYT* exposé also revealed, *inter alia*, (i) insufficient four-month safety checks, (ii) potentially fatal ruptures, (iii) failure to meet the usual criteria for an adequate and well-controlled study; (iv) HAV's success rate in its key study was only 67% – not 84% as the Individual Defendants had claimed, and (v) one FDA medical device reviewer had even retired in protest over these issues.

194. The *NYT* exposé revealed that the Individual Defendants had mispresented the true performance, safety, efficacy, and risks of the HAV, stating in pertinent part:

> When the biotech company Humacyte designed a study to see if its lab-grown blood vessel worked, it decided to measure whether blood was flowing freely through the high-tech tube 30 days after it was implanted in a person.
>
> As those days passed, some of the 54 patients in the study ran into trouble. Doctors lost track of one. Four died. Four more had a limb amputated, including one who developed a clot and infection in the artificial vessel, [FDA] records show.
>
> Humacyte, which is traded on the Nasdaq, counted all those patients as proof of success in talks with investors and in an article in JAMA Surgery.

195. The *NYT* exposé also discussed how two FDA reviewers had flagged concerns about the HAV's safety:

> Before the vessel was approved, one [FDA] medical reviewer pointed out that 37 of the 54 patients were not assessed in a safety check four months after getting the implant, with many dead or lost to follow-up. "There is significant uncertainty regarding the safety and effectiveness of this product beyond 30 days," the [FDA]. report says.
>
> Dr. Robert E. Lee, a vascular surgeon who cared for gunshot-wounded patients in Detroit for 30 years, retired in the fall from the [FDA] in protest over the matter. In a review of more than 2,000 pages of company records conducted when he was an [FDA] medical officer, Dr. Lee found that the vessel could rupture with no

> warning. Those events were "unpredictable, catastrophic and life-threatening," he wrote in his [FDA] review, parts of which were made public weeks ago.

196. Dr. Lee was also quoted as saying the risk of HAV rupture was "unacceptable . . . for whatever slim benefit, if any, this product provides above the current standard treatments." The *NYT* exposé reported how Dr. Lee had tried, and failed, to persuade the FDA to hold a public advisory committee meeting to discuss concerns about the HAV study:

> Dr. Lee failed to persuade top [FDA] officials to hold a public advisory committee meeting where the study results could be discussed and reviewed by independent experts. The agency decided instead to send records to three external reviewers, who in turn identified failure of the Humacyte vessels "as a serious risk," but added that "the appropriate patient population" would benefit, according to documents.

197. Additionally, the *NYT* exposé also identified misrepresentations in the *JAMA Surgery* article titled, "Bioengineered Human Arteries for the Repair of Vascular Injuries." The *NYT* exposé reported:

> The article stated that the Humacyte vessel "demonstrates improved outcomes" over other artificial vessels.
>
> It also said the Symvess "provides benefits" in "infection resistance." The [FDA] review said there was no clinical evidence demonstrating that extra effect.

198. Finally, the *NYT* exposé discussed one FDA statistician's critical assessment of the trial data the Company had submitted for approval:

> Thomas Zhou, a biostatistician in the biologics division of the [FDA], also flagged concerns from the U.S. arm of the study and the data from Ukraine.
>
> "Neither study met the usual criteria for an adequate and well-controlled trial," he wrote.
>
> The study of 16 patients treated in Ukraine was retrospective and observational, meaning researchers could look back at a larger pool of data and select the best cases. It showed "limited support of efficacy," partly because the injuries were "skewed to shrapnel injuries" and not the devastating wounds typically seen on the battlefield, he said.
>
> The U.S. study was "poorly conducted" and underwent "multiple major changes" during the trial, the statistical review said.

> The records also show that [FDA] scientists dismissed as successful the patient deaths and amputations, citing a lack of information or imaging studies.

***The March 25, 2025 Bloomberg Article***

199. Then, on March 25, 2025, *Bloomberg* published an article stating that one FDA reviewer had said that Humacyte's two trials could not be combined and that Humacyte repeatedly attempted to change its clinical studies while they were still ongoing. The article also reported safety concerns including the "serious risk" of failure and the fact that the product did not "demonstrate superiority to existing treatment options."

200. Also on March 25, 2025, the Company announced pricing for a public offering of 25 million shares. The final prospectus finalized the price at $2.00 per share – substantially lower than the $2.86 closing price earlier that day.

201. On this news, Humacyte's common stock dropped from $3.32 per share at market close on March 24, 2025, to $2.88 per share at market close on March 25, 2025 – a decrease of approximately 13%. Then, the stock price further declined approximately 31%, closing at $2.00 per share on March 26, 2025.

## THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

202. During the period of wrongdoing described above, Humacyte insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

203. The Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- Between August 17, 2023, and November 20, 2024, Dougan, primarily through Ayabudge, sold 8,259,852 shares for proceeds of over $39 million.

- Between May 30, 2024, and May 31, 2024, Prichard sold 191,511 shares for proceeds of over $1.5 million.
- On August 27, 2024, Sander sold 39,389 shares for proceeds of over $263,000.
- On September 10, 2024, Sebelius sold 5,182 shares for proceeds of over $28,000.

204. While many of the Company's stockholders lost significant amounts of money when the Company's shares dropped substantially upon the revelation of the fraud, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by public stockholders

205. As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Humacyte stock and stock options they held.

**AN INVESTOR FILES A SECURITIES CLASS ACTION**

206. On November 18, 2024, the Securities Class Action captioned *In re Humacyte, Inc. Securities Litigation*, Case No. 1:24-cv-00954, was filed in the United States District Court for the Middle District of North Carolina against Humacyte, Niklason, Prichard, and Sander. The Securities Class Action alleges that throughout the class period of August 14, 2023 to March 25, 2025, the defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Securities Class Action alleges that the defendants "engaged in a three-prong fraud, with materially false or misleading statements and omissions that artificially inflated the price of Humacyte's securities." As alleged in the Securities Class Action, these frauds included: "Product Safety Fraud . . . tout[ing] the HAV's safety and efficacy while downplaying and/or not

acknowledging serious known safety concerns, as well as reporting positive aspects of Humacyte's V005 Phase 2/3 clinical trial and V017 Ukraine trial results, without acknowledging the inherent flaws in Humacyte's statistical analysis"; "Facility Fraud . . . about [the Durham Facility], including its readiness to safely manufacture the HAV, the sufficiency of the facility's quality assurance and oversight for FDA approval in the vascular trauma indication, and the FDA's inspections of the Durham Facility"; and "Liquidity Fraud, whereby [the defendants] repeatedly made some version of this statement, over time: "The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these interim financial statements."

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT DIRECTLY AND PROXIMATELY DAMAGED HUMACYTE

207. As a result of the Individual Defendants' improprieties, Humacyte disseminated improper public statements concerning Humacyte's operations, prospects, and internal controls. This misconduct has devastated Humacyte's credibility.

208. As a direct and proximate result of the Individual Defendants' actions, Humacyte has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

209. As a direct and proximate result of the Individual Defendants' actions as alleged above, Humacyte's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

210. Lastly, the actions of the Individual Defendants have irreparably damaged Humacyte's corporate image and goodwill. For at least the foreseeable future, Humacyte will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that

have been implicated in illegal behavior and have misled the investing public, such that Humacyte's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

211. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

212. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

213. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

214. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

215. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and was at all times acting within the course and scope of such agency.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

217. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

218. Plaintiff is an owner of Humacyte common stock and has been an owner of Humacyte common stock since the wrongdoing alleged herein.

219. Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

### Demand Is Futile

#### *Demand Is Futile Because Each Member of the Board Faces a Substantial Likelihood of Personal Liability*

220. At the time Plaintiff commenced this action, the Board consisted of the twelve Director Defendants: Bamforth, Brown, Constantino, Dougan, Green, Jones, Niklason, Pope, Sebelius, Seimetz, Wallace, and Windham-Bannister. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

221. The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Humacyte's business, operations, prospects, internal controls, and financial statements.

222. Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

223. The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

224. Certain Director Defendants – namely, Brown, Constantino, Dougan, Green, Niklason, Pope, Sebelius, Seimetz, Wallace, and Windham-Bannister – also approved the

2024 Proxy Statement and, therefore, face a further substantial likelihood of personal liability because of the false and misleading statements contained therein.

225. If the Director Defendants were to bring a suit on behalf of Humacyte to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff's making a demand would be futile.

***The Audit Committee Defendants Face an Even Greater Likelihood of Personal Liability***

226. The Audit Committee Defendants (Constantino, Sebelius, and Windham-Bannister), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false and misleading information. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial reporting process and its systems of internal controls, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

***The Commercial Committee Defendants Face an Even Greater Likelihood of Personal Liability***

227. The Commercial Committee Defendants (Bamforth, Green, Jones, Pope, Seimetz, and Windham-Bannister), as members of the Commercial Committee during the Relevant Period, participated in and knowingly approved the filing of false and misleading information. More specifically, as members of the Commercial Committee, the Commercial Committee Defendants were obligated to, among other things, assist the Board on matters relating to the Company's strategy, activities, and investment in development, manufacturing, and go-to-market strategies. Instead, the Commercial Committee Defendants, as members of the Commercial Committee,

failed to ensure the integrity of the Company's manufacturing and quality control processes. For this reason, the Commercial Committee Defendants cannot exercise disinterested business judgment in considering a demand.

***The Insider Trading Defendants on the Board Face an Even Greater Likelihood of Personal Liability***

228. Because of their positions as officers and/or board members, each of the Insider Trading Defendants on the Board (Dougan and Sebelius) possessed material non-public information about the Product Safety Fraud, the Liquidity Fraud, and the Facility Fraud.

229. Dougan and Sebelius unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices. As a result, Dougan and Sebelius' conduct harmed Humacyte as they unjustly enriched themselves at the Company's expense. Accordingly, because this action asserts claims for unjust enrichment against the Insider Trading Defendants, and because Dougan and Sebelius face a substantial likelihood of liability for these claims as well as for their breaches of fiduciary duty to the Company, Dougan and Sebelius are incapable of considering a demand to commence and vigorously prosecute this action.

***Niklason, Dougan, Sebelius, and Wallace Lack Independence***

230. Niklason and Dougan are not independent directors pursuant to the 2024 Proxy Statement.

231. Moreover, Niklason and Dougan are married. Accordingly, they could not exercise independent judgment in considering a demand to investigate and prosecute the claims asserted in this action because it would require them to sue the members of the Board, including each other.

232. In addition, Niklason is a named defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act. If the Company

is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Niklason's willful and/or reckless violations of her obligations as CEO and director of Humacyte. Hence, Niklason is incapable of considering a demand to commence and vigorously prosecute this action because she faces an even greater likelihood of personal liability than the rest of the Individual Defendants.

233. Additionally, Dougan, Niklason, Sebelius, and Wallace have longstanding personal and business relationships.

234. Niklason has served as President, CEO, and a member of the Board since the Merger. Previously, she served as President and CEO of Legacy Humacyte since November 2020 and as a member of the Legacy Humacyte board of directors since 2004. She also served in a senior scientist capacity at the Company from 2005 through 2020.

235. Dougan has served as a member of the Board since the Merger. He previously served as a member of Legacy Humacyte's board of directors since 2005, and as its chair from March 2019 to August 2021.

236. Wallace has served as a member of the Board since the Merger and previously served as a member of Legacy Humacyte's board of directors since June 2005.

237. Sebelius is the chair of the Board and has served as a member of the Board since the Merger. Previously, she served as a member of Legacy Humacyte's board of directors since September 2015.

238. Accordingly, based on the personal and business relationship between and among Dougan, Niklason, Sebelius, and Wallace, they could not exercise independent business judgment in considering a demand to investigate and prosecute this action.

## FIRST CAUSE OF ACTION
## Against the Individual Defendants for Breach of Fiduciary Duties

239. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

240. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Humacyte's business and affairs.

241. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

242. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Humacyte.

243. In breach of the fiduciary duties they owed and owe to Humacyte, the Individual Defendants willfully or recklessly made, or caused, or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose to investors, *inter alia*, that: (i) the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies, (ii) the Company did not have sufficient funds for operations without cash infusions from public offerings and contingent funding; and (iii) the Individual Defendants did not fulfill their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility. Specifically, the Individual Defendants' statements about the Company's cash and cash equivalents were false and misleading because they failed to disclose that, in reality, the Company was facing liquidity crunches that would ultimately result in public offerings at share prices significantly discounted from the prevailing stock prices and that their liquidity depended on contingent funding. Furthermore, the Individual Defendants failed to

disclose that due to the failures of oversight and quality assurance: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma.

244. Accordingly, Humacyte's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

245. The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

246. The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

247. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

248. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to

maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

249. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

250. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Humacyte has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against Certain Individual Defendants for**
**Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

251. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

252. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

253. The 2024 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Humacyte stockholder votes for, *inter alia*, director reelection, while simultaneously

misrepresenting and/or failing to disclose that: (i) although Humacyte claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants were violating the Code of Conduct; (ii) contrary to the 2024 Proxy Statement's representation that the named executive officers had met the Company's corporate objectives in 2023 regarding the HAV's regulatory submissions and product approval, readiness for HAV market launch, financial stability, in reality the named executive officers had not satisfied these corporate objectives; and (iii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Humacyte to issue false and misleading statements.

254. The 2024 Proxy was also materially misleading because it failed to disclose to investors, *inter alia*, that (i) the HAV had serious health and safety issues, such as the risk of rupture and flaws in the studies, (ii) the Company did not have sufficient funds for operations without cash infusions from public offerings and contingent funding; and (iii) the Individual Defendants did not fulfill their oversight duties for mission-critical health and safety issues involving quality assurance and microbial testing at the Durham Facility. Specifically, the Individual Defendants' statements about the Company's cash and cash equivalents were false and misleading because they failed to disclose that, in reality, the Company was facing liquidity crunches that would ultimately result in public offerings at share prices significantly discounted from the prevailing stock prices and that their liquidity depended on contingent funding. Furthermore, the Individual Defendants failed to disclose that due to the failures of oversight and quality assurance: (a) the Durham Facility failed to comply with good manufacturing practices, including quality assurance and microbial testing; (b) the FDA's review of the BLA would be

delayed while Humacyte remediated these deficiencies; and (c) as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma..

255. In the 2024 Proxy Statement, Brown, Constantino, Dougan, Green, Niklason, Pope, Sebelius, Seimetz, Wallace, and Windham-Bannister made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the process and in the preparation of the 2024 Proxy Statement, these individual defendants were aware of this information and of their duty to disclose this information in the 2024 Proxy Statement.

256. These individual defendants knew that the statements contained in the 2024 Proxy Statement were materially false and misleading.

257. The omissions and false and misleading statements in the 2024 Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2024 Proxy Statement and in other information reasonably available to stockholders.

258. As a direct and proximate result of the dissemination of the false and misleading 2024 Proxy Statement that these individual defendants used to obtain stockholder approval of and thereby re-elect certain directors, Humacyte suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**Against the Individual Defendants for Unjust Enrichment**

259. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

260. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Humacyte.

261. The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Humacyte that was tied to the performance or artificially inflated valuation of Humacyte, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

262. Plaintiff, as a stockholder and representative of Humacyte, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits – including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation – obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

263. Plaintiff, on behalf of Humacyte, has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**Against the Individual Defendants for Waste of Corporate Assets**

264. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

266. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

267. Plaintiff, on behalf of Humacyte, has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Against the Individual Defendants for Aiding and Abetting**

268. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

269. Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Humacyte and has participated in a conspiracy in breach of fiduciary duties.

270. In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

271. The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

272. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

273. Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

274. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**SIXTH CAUSE OF ACTION**
**Against the Insider Trading Defendants for**
**Insider Selling and Misappropriation of Information**

275. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

276. At the time of their stock sales set forth herein, the Insider Trading Defendants (Dougan, Prichard, Sander, and Sebelius) knew of the information described above and sold Humacyte common stock on the basis of such information.

277. The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Humacyte common stock.

278. The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

279. Because the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the

imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Humacyte and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C. Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of Humacyte stock while in possession of insider information as described herein;

D. Awarding prejudgment interest to the Company;

E. Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 9, 2025

*/s/ P. Bradford deLeeuw*
**DELEEUW LAW LLC**
P. Bradford deLeeuw (#3569)
1301 Walnut Green Road
Wilmington, DE 19807
Tel: (302) 274-2180
brad@deleeuwlaw.com

*Counsel for Plaintiff Ian Dusci*

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Marion C. Passmore
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506
fortunato@bespc.com
passmore@bespc.com